**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4656**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

MOISES ORLANDO ZELAYA-VELIZ, a/k/a Moises Zelaya-Beliz, Moizes Zelaya Bonilla, a/k/a Zelaya Hernandez,

        Defendant – Appellant.

---

**22-4659**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

JONATHAN RAFAEL ZELAYA-VELIZ, a/k/a Rafael Zelaya, a/k/a Jonathan Zelaya,

        Defendant – Appellant.

---

**22-4669**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

GILBERTO MORALES, a/k/a Chapin, a/k/a Chucha,

        Defendant – Appellant.

---

**22-4670**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

LUIS ALBERTO GONZALES, a/k/a Luis Figo, a/k/a China, a/k/a Chinita,

        Defendant – Appellant.

---

**22-4684**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

2

JOSE ELIEZAR MOLINA-VELIZ, a/k/a Jose Eliezar Hernandez,

        Defendant – Appellant.

-----

**22-4685**

-----

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

SANTOS ERNESTO GUTIERREZ CASTRO, a/k/a Gutierrez Hernestho,

        Defendant - Appellant.

-----

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, Senior District Judge. (1:20-cr-00196-AJT-1; 1:20-cr-00196-AJT-10; 1:20-cr-00196-AJT-9; 1:20-cr-00196-AJT-6; 1:20-cr-00196-AJR-4; 1:20-cr-00196-AJT-5)

-----

Argued:  December 8, 2023                Decided:  February 16, 2024

-----

Before WILKINSON, WYNN, and RICHARDSON, Circuit Judges.

-----

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Wynn and Judge Richardson joined.

-----

**ARGUED:**  Joseph Douglas King, KING CAMPBELL PORETZ & THOMAS, PLLC, Alexandria, Virginia, for Appellants.  Maureen Catherine Cain, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** Christopher B. Amolsch, Reston, Virginia, for Appellant Jonathan Rafael Zelaya-Veliz.

3

Donna L. Biderman, LAW OFFICE OF DONNA L. BIDERMAN, Fairfax, Virginia, for Appellant Gilberto Morales. Donald E. Harris, HARRIS LAW FIRM, Alexandria, Virginia, for Appellant Jose Eliezar Molina-Veliz. Dwight E. Crawley, LAW OFFICE OF DWIGHT CRAWLEY, Washington, D.C., for Appellant Ernesto Santos Gutierrez Castro. Jeffrey D. Zimmerman, JEFFREY ZIMMERMAN, PLLC, Alexandria, Virginia, for Appellant Luis Alberto Gonzales. Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

4

WILKINSON, Circuit Judge:

After a seven-day trial, six men affiliated with the transnational criminal organization MS-13 were convicted of sex trafficking a thirteen-year-old girl by force, fraud, or coercion, and conspiracy to do the same. Five of the men appeal the district court's denial of their motions to suppress evidence obtained from Facebook warrants, contending the warrants failed the probable cause and particularity requirements of the Fourth Amendment. The sixth man appeals the district court's denial of his motion for acquittal, contending that the evidence presented at trial was insufficient to sustain his conviction. For the following reasons, we reject these claims and affirm each of the convictions.

## I.

### A.

The six appellants are members and associates of the transnational criminal street gang Mara Salvatrucha (MS-13). In 2018, they worked together to sexually exploit and physically abuse a thirteen-year-old girl—referred to in this opinion as Minor-2—and other underage victims in Northern Virginia and Southern Maryland.

On August 27, 2018, Minor-2 ran away from a youth shelter in Fairfax County, Virginia in search of a better living situation. Minor-2 had been in the shelter for just over two months before leaving. While at the shelter, she met sixteen year old Minor-3, who told Minor-2 that she could use her connections with MS-13 to have the gang protect them if they ran away.

The girls proceeded to meet up with MS-13 members. Minor-3 introduced Minor-2 to them, and the members asked Minor-2 her age. She told them she was thirteen years old.

5

Nevertheless, they decided to enlist her in the gang, promising that they would protect her and her family. The gang members proceeded to initiate Minor-2 into MS-13 by beating her with a metal baseball bat. The first hit was so painful that Minor-2 begged them to stop, but the gang members said that if they stopped they would have to kill her and her family. She was struck a total of twenty-six times. The pain was so excruciating that Minor-2 later reported that she thought she was going to die. After the beating finished, Minor-2 wanted to run but couldn't muster the strength to move her battered legs.

At least four MS-13 members participated in the beating. They struck Minor-2 with the metal bat in front of at least five witnesses including Minor-3 and Minor-1, a fourteen-year-old who was also a victim of MS-13's child sex trafficking. A detective testified at trial that Minor-2's treatment was representative of how MS-13 initiates females into the gang: by beating them in multiples of thirteen and sexually exploiting them.

After Minor-2 was beaten, she was taken to an apartment in Woodbridge, Virginia where appellants Moises Zelaya-Veliz and Jose Eliezar Molina-Veliz harbored her. Moises, who was a full-fledged member of MS-13, was aware Minor-2 had been beaten by his gang. The two men kept Minor-2 confined in their house out of fear that she would report them or their gang to the police.

Moises and Jose both engaged in sexual intercourse with Minor-2 in the apartment. They also sold her for sex to friends and acquaintances. On one occasion, at least five men engaged in sexual intercourse with Minor-2 outside the apartment complex as Moises watched from his porch. Minor-2 repeatedly pleaded for them to let her go home, but they refused. To dissuade her from running away, MS-13 members threatened that they would

6

kill her family if she left. Later, when an MS-13 member found Minor-2 using another gang member's phone, she was taken back to the site of her first beating and beaten an additional twenty-six times with the same metal bat as punishment.

Appellant Santos Ernesto Gutierrez Castro met Minor-2 at Moises and Jose's apartment. Santos subsequently took Minor-2 to his house and gave her marijuana. He wanted to sell Minor-2 for sex, and so he began making calls to potential customers, offering them the opportunity to have sex with Minor-2 for $100 an hour. The first day, Santos sold Minor-2 for sex to more than ten men. He kept Minor-2 at his house for at least three more days, during which time he had sex with her himself and continued to sell her for sex with others. When he was finished, he took Minor-2 to a co-conspirator's house in Maryland.

Upon her arrival in Maryland, Minor-2 was still limping and bruised from the two beatings. But the gang was undeterred. Appellant Luis Alberto Gonzales, who was a member of MS-13, took over the trafficking. He shuffled Minor-2 between several different Maryland residences where he sold her for sex in exchange for cash and cocaine.

Appellant Gilberto Morales met Minor-2 at one of those Maryland residences. He gave Luis several grams of cocaine so that he could have sex with Minor-2. After the transaction, Gilberto stayed in contact with Minor-2. They communicated with each other over the phone and on Facebook more than 130 times during October 2018.

Gilberto was not the only one who tried to establish a more "personal" connection with Minor-2. Luis worked to convince Minor-2 that he was her friend and boyfriend. But all the while he continued to sell her for sex to other men and to have sex with her himself.

7

Eventually, Luis took Minor-2 to an apartment complex in Mount Rainier, Maryland, where appellant Jonathan Zelaya-Veliz and other co-conspirators resided. Minor-2 was confined there for about two weeks by Luis and Jonathan. During Minor-2's trafficking, Jonathan had sex with her and was involved, along with Luis, Moises, and Santos, in coordinating her transportation to various locations in Virginia and Maryland where she was sold for sex. On the first night in Mount Rainier, at least five men came to the apartment and forced Minor-2 to have sex with them. She cried the entire time, but the men kept going. Their abuse caused such excruciating pain that she later reported she wanted to die to end the suffering.

Over the following two weeks, Luis and a co-conspirator set up prostitution dates for Minor-2 with nearby customers. They sold her for sex up to seven hours a day. Luis would sedate Minor-2 with alcohol and drugs, including marijuana and cocaine, before driving her to customers' homes and making her have sex with them. One of these men sent Luis a video of him sexually penetrating Minor-2.

Minor-2 longed to escape, but feared that doing so would jeopardize her and her family's safety. Luis kept threatening her, telling her that there were many gang members around the apartment complex that would find her if she tried to run away. She was also told that Luis could see anyone she talked to on the phone he gave her.

Nevertheless, Minor-2 managed to escape. On October 11, 2018, she was recovered by law enforcement outside the Mount Rainier apartment complex.

* * *

8

Through physical violence and under the threat of her and her family's death, Minor-2 was forced by the appellants and other MS-13 associates to have sex with dozens of adult men. They confined her to their residences, trafficked her across state lines, and used her body at will. Over the more than six weeks she spent at the mercy of her traffickers, Minor-2 was beaten viciously, infected with sexually transmitted diseases, and subjected to unconscionable psychological trauma.

B.

In meetings with local law enforcement officers after her escape, Minor-2 was unable to identify the full names of her abusers. She also had difficulty identifying the locations where she was trafficked. She was, however, able to identify numerous perpetrators based on photos of men that law enforcement suspected of being involved in her trafficking. Minor-2 also relayed that Minor-1 was being sexually exploited by MS-13 and provided information to help identify her. This led to law enforcement locating and recovering Minor-1 from a known MS-13 location, where she was found with an MS-13 member.

As the scope of MS-13's sex trafficking conspiracy became apparent, the matter escalated into a federal investigation led by FBI Special Agent Jeremy Obie of the Bureau's Child Exploitation and Human Trafficking Task Force in Washington, D.C. Based on information that local law enforcement had earlier gathered, Special Agent Obie determined that the suspects were likely using Facebook to sex traffic Minor-1, Minor-2, and other victims. Thus, over the course of the multi-month investigation, Special Agent

Obie obtained four so-called Facebook warrants, which compelled Facebook to turn over data on specified social media accounts.

The following paragraphs describe the four Facebook warrants, as their constitutionality is central to the appellants' appeal.

### The First Warrant

The first Facebook warrant was approved on March 14, 2019 by U.S. Magistrate Judge John F. Anderson in the Eastern District of Virginia. The warrant ordered Facebook to give the government nine categories of information on five different Facebook accounts, including all private communications made or received by the accounts. Four of the accounts were operated by MS-13 member Sioni Alexander Bonilla Gonzalez, who pled guilty before trial for his involvement in the sex trafficking conspiracy and is not a party to this appeal. The fifth account was operated by a person who was known to have communicated over Facebook with Minor-1 but who is also not a party to this appeal. The warrant contained no time limitations, and thus impliedly authorized the government to search all account data disclosed by Facebook from the time since the accounts' respective dates of creation until the time that the warrant was sworn out.

The warrant followed a standard two-step search and seizure process. It first authorized the government to search the entirety of the data disclosed by Facebook. It then authorized the seizure of specific categories of information revealed during that search; namely, information that constituted fruits, evidence, or instrumentalities of violations of four federal criminal statutes—18 U.S.C. § 1591 (sex trafficking of a minor by force, fraud, or coercion); 18 U.S.C. § 1952 (travel or use of the mail or facility of interstate commerce

10

in aid of prostitution or other racketeering enterprises); 18 U.S.C. § 2422(a) (coercion or enticement of a person to travel across state lines for prostitution or illegal sexual activity); and 18 U.S.C. § 2423(a) (interstate transportation of a minor for purposes of prostitution or illegal sexual activity)—and attempts and conspiracies to violate these statutes.

The affidavit supporting the warrant provided an overview of the four federal crimes under investigation. It discussed the mechanics of Facebook and the types of data created and stored on the platform. It further explained how Special Agent Obie had learned through training and experience that violent gangs like MS-13 engage in human sex trafficking as a source of revenue. Additionally, the affidavit relayed that individuals engaged in sex trafficking will often use Facebook to facilitate such criminal activity, and that MS-13 members were generally known to use Facebook to coordinate and arrange prostitution and other crimes.

The affidavit went on to provide case-specific information to establish probable cause for the search and seizure of data from the five Facebook accounts. It explained that adult men, including Sioni, had discussed commercial sex activities with Minor-2 on Facebook. It also established that Sioni had engaged in sexual activity with Minor-1.

**The Second Warrant**

Special Agent Obie obtained a second warrant in the Eastern District of Virginia, signed by U.S. Magistrate Judge Ivan D. Davis, on June 5, 2019. This warrant ordered Facebook to give the government the same nine categories of information as in the first warrant, but this time on eight new Facebook accounts. Five of these accounts belonged to appellant Luis Gonzales, and the other three belonged to co-conspirators who are not

11

parties to this appeal. Just like the first warrant, this one authorized the search of all account data going back to the accounts' respective dates of creation, and it permitted the seizure of information that constituted fruits, evidence, or instrumentalities of the same four federal offenses.

The affidavit supporting this warrant provided the same information as did the first warrant regarding the statutory offenses, the mechanics of Facebook, and MS-13's operation of prostitution enterprises. It also provided twenty pages of investigative findings, photos, and screenshots of communications which detailed MS-13's exploitation of Minor-2. Some of this evidence was derived from the previous warrant-backed seizure of Facebook account data.

The affidavit discussed photographs of Luis Gonzales that had been posted by five different Facebook accounts. Each of the accounts was named "Luis Figo." Minor-2 identified these photographs to be pictures of "Luis," whom she said was an MS-13 member integral to her physical abuse and sex trafficking. The affidavit described how Luis had sold Minor-2 to customers, forced her to have sex, and sedated her with drugs and alcohol before prostitution dates. It further described how the investigation had unearthed that a credit card in Luis's name was used to pay for the phone bill of the cell phone that Minor-2 possessed when she was recovered by law enforcement. The affidavit also revealed that Luis had spent significant time at the apartment complex where Minor-2 was recovered.

**The Third Warrant**

12

The next Facebook warrant obtained by Special Agent Obie was signed by Judge Anderson on July 12, 2019. It ordered Facebook to disclose information associated with ten accounts. One of the accounts belonged to appellant Moises Zelaya-Veliz. Four of the accounts belonged to MS-13 affiliates who were unindicted co-conspirators. The remaining five accounts belonged to Minor-1, Minor-2, and Minor-3.

While the first two warrants contained no temporal limitation on what data could be searched, this warrant ordered Facebook to disclose information from January 1, 2018 to the date the warrant was sworn out. The warrant also broadened the scope of the information that Facebook was required to turn over. It mandated disclosure of eighteen different categories of data from Facebook, including a broader set of user activity, IP addresses, device identifier logs, and all location information associated with the accounts.

Just like the first two warrants, this warrant only permitted the government to seize information that constituted fruits, evidence, or instrumentalities of the four previously enumerated offenses plus one additional offense: 18 U.S.C. § 1959 (violent crimes in aid of racketeering).

Special Agent Obie's affidavit provided general information on the statutory offenses at issue, the mechanics of Facebook, and MS-13's operation of prostitution enterprises. It also provided a glossary of terminology frequently used by MS-13.

The affidavit went on to offer thirty pages of case-specific information, including screenshots and transcripts of conversations about the sex trafficking of Minor-2. It explained that Minor-2 told law enforcement that she had been taken to the home of Moises Zelaya-Veliz after her initial beating. It described how investigating officers knew Moises

13

operated the Facebook account targeted by the search warrant, which used the name "Moizes Zelaya Bonilla," because his Facebook profile picture matched pictures in a law enforcement database. The affidavit additionally relayed that the warrant-backed search of Sioni Gonzalez's Facebook account had revealed that Moises had used Facebook to send photos of firearms, illegal drugs, and MS-13 gang signs.

### The Fourth Warrant

The fourth and final Facebook warrant was signed by then U.S. Magistrate Judge Michael S. Nachmanoff on February 20, 2020. This warrant authorized the search of information from twenty-two Facebook accounts, including accounts belonging to four appellants—Jose Molina-Veliz, Santos Gutierrez Castro, Jonathan Rafael Zelaya-Veliz, and Gilberto Morales—as well as multiple accounts of unindicted co-conspirators.

Like the third warrant, the final warrant required Facebook to provide account information from January 1, 2018 to the date the warrant was sworn out. The warrant used the same list of eighteen types of information for Facebook to disclose as in the third warrant. And, just like the previous warrant, it limited the government's seizure to include only information discovered during the search that constituted fruits, evidence, or instrumentalities of the five enumerated offenses.

Special Agent Obie's affidavit, as in his previous warrant applications, described the statutory offenses at issue, the mechanics of Facebook, and MS-13's operation of prostitution enterprises. By the time of the affidavit's filing, over ten months after the initial Facebook warrant, the government had compiled a substantial investigative record into MS-13's sex trafficking of Minor-1, Minor-2, and Minor-3. The affidavit thus provided

14

over fifty pages of case-specific information, which included descriptions, images, and transcripts of the illicit activities of the appellants and their co-conspirators. The affidavit's detailed account revealed how each of the four appellants targeted by this warrant had participated in the sex trafficking of Minor-2.

With respect to Jose Eliezar Molina-Veliz, whose Facebook account used the name "Jose Eliezar Hernandez," the affidavit used returns from previous Facebook warrants to describe how he had engaged in sexually explicit communications over Facebook with Minor-2 and Minor-3 during the period that the two girls were being exploited by MS-13. It also recounted how he had used Facebook to coordinate Minor-2's transportation for sex.

With respect to Santos Gutierrez Castro, who went by "Gutierrez Hernestho" on Facebook, the affidavit explained that Minor-2 had taken a photo of Minor-3 and Santos the day after Minor-2 had initially been beaten in the garage, and subsequently posted that photo on her Facebook. The affidavit further relayed that Santos had used Facebook to solicit sexually explicit photos and in-person sexual acts from Minor-2 in exchange for money and illegal drugs. It shared evidence that Santos was using Facebook to coordinate sending multiple prostitution customers to Minor-2 so that they could sexually exploit her. And it discussed how a phone number known to be used by Santos was linked to the targeted Facebook account.

With respect to Jonathan Rafael Zelaya-Veliz—who operated four Facebook accounts under the names "Jonathan Zelaya" and "Rafael Zelaya"—the affidavit explained that Minor-2 knew Jonathan as Moises Zelaya-Veliz's brother. It identified Jonathan as living at the apartment complex where Minor-2 had been held during the final two weeks

15

of her exploitation. And it explained that Jonathan had used Facebook to communicate with Moises about having sex with Minor-2.

With respect to Gilberto Morales, the affidavit discussed how Minor-2 had identified him as one of the men who sexually abused her. It explained that Gilberto had been in regular contact with Minor-2 during her abuse. And it shared a transcript of a conversation in which Gilberto admitted to being business partners with Luis Gonzales in the sex trafficking of Minor-2 and sought out an additional partner for the operation.

**Summary of Facebook Warrants**

The following table summarizes the four Facebook warrants executed by the government. *See* Appellants' Brief at 9–10.

| Date of issuance | No. of accounts searched | Appellants' accounts searched | Data disclosed | Temporal limitation |
|---|---|---|---|---|
| Mar. 14, 2019 | 5 | None | Short list[1] | None |
| Jun. 5, 2019 | 8 | Luis Gonzales | Short list | None |
| Jul. 12, 2019 | 10 | Moises Zelaya-Veliz | Long list[2] | January 1, 2018 to date of warrant execution |
| Feb. 20, 2020 | 22 | Jose Eliezar Molina-Veliz, Santos Ernesto Gutierrez Castro, Gilberto Morales, and Jonathan Rafael Zelaya-Veliz | Long list | January 1, 2018 to date of warrant execution |

---

[1] Nine categories of information, including all communications sent to and from the accounts.

[2] Eighteen categories of information, including all of the accounts' communications and location information.

16

C.

On August 27, 2020, a grand jury in the Eastern District of Virginia returned a multi-count indictment against the six appellants and five additional defendants, charging them with child sexual exploitation-related offenses in violation of 18 U.S.C. §§ 1591, 1594, and 2423, and assault with a dangerous weapon in aid of racketeering activity in violation of 18 U.S.C. § 1959. A superseding indictment issued on April 19, 2022.

Before trial, Moises Zelaya-Veliz, Jose Molina-Veliz, Luis Gonzales, Gilberto Morales, and Jonathan Zelaya-Veliz moved to suppress the evidence obtained from the Facebook warrants. They argued the warrants lacked probable cause and were insufficiently particularized.

The district court denied the motions to suppress in a ruling from the bench. It found that the Facebook warrants were supported by probable cause, stating that "the magistrate judges [who issued the warrants] in each instance did have a substantial basis for concluding, as to each of the defendants, a sufficient nexus existed between the Facebook accounts to be searched and the crimes under investigation." J.A. 114–15. The court next found that the warrants were sufficiently particular in timeframe and scope. The timeframe of the warrants was reasonable, according to the court, because the searches supported an investigation beyond Minor-2's abuse into an "extensive ongoing interstate criminal enterprise of uncertain beginnings," and because the government narrowed the timeframe of the information sought as the investigation progressed. J.A. 115. And the court found that the scope of the information sought was reasonable because, based on the information submitted to the magistrates, there was a substantial basis to believe that all of the

17

categories of information sought were relevant to establishing the identities of perpetrators and revealing their criminal activities.

The six appellants proceeded to a jury trial on June 1, 2022. During the course of the seven-day trial, the government extensively employed information that it had obtained from the Facebook warrants. It admitted dozens of exhibits of Facebook-warrant-derived evidence and discussed this evidence at length in its opening and closing statements.

The jury deliberated for three days before returning convictions for each appellant. Santos Gutierrez Castro, Luis Gonzales, Jose Molina-Veliz, Jonathan Zelaya-Veliz, and Moises Zelaya-Veliz were each convicted of sex trafficking a minor under the age of fourteen, conspiracy to do the same, and conspiracy to transport a minor across state lines for purposes of prostitution or other illegal sexual activity. Gilbert Morales was convicted of sex trafficking of a minor under the age of fourteen and conspiracy to do the same.

After trial, all appellants made oral motions for judgment of acquittal under Federal Rule of Criminal Procedure 29. The court denied those motions on October 7, 2022.

The district court sentenced the appellants on November 10, 2022. Their respective terms of imprisonment were 300 months for Luis Gonzales, 264 months for Moises Zelaya-Veliz, and 180 months each for Santos Gutierrez Castro, Jose Molina-Veliz, Gilberto Morales, and Jonathan Zelaya-Veliz.

The appellants timely appealed. The five appellants who had moved to suppress evidence derived from the Facebook warrants challenge the district court's denial of their motions to suppress, claiming that the warrants lacked probable cause and were insufficiently particularized. The sixth appellant, Santos Gutierrez Castro, challenges the

18

district court's denial of his motion for acquittal, claiming that insufficient evidence was presented at trial to sustain his convictions.

## II.

We start with the appellants' contention that the district court erred in denying their motions to suppress evidence from the Facebook warrants. Before analyzing their specific claims, we first determine which warrants the appellants have Fourth Amendment standing to challenge. We next address the appellants' claims that the warrants lacked probable cause and were insufficiently particularized, taking each issue in turn.

## A.

As an initial matter, we note that a defendant can only challenge a warrant that authorizes the search or seizure of items in which he had a protected Fourth Amendment interest. It is insufficient for the defendant to show that a third party had a protected interest in the information searched because "it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Rakas v. Illinois*, 439 US 128, 134 (1978). Thus, to prevail in a motion to suppress evidence obtained from a search, a defendant has the burden of showing that the government implicated a protected interest of his in conducting that search. *See id.* at 130 n.1 (1978). Courts often refer to the requirement that a defendant show that a search implicated his protected interest as "Fourth Amendment standing," although it "should not be confused with Article III standing" because it is "not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Byrd v. United States*, 584 U.S. 395, 410–11 (2018).

19

As the defense conceded at oral argument, none of the appellants has Fourth Amendment standing to challenge the first Facebook warrant. That warrant only targeted accounts belonging to two co-conspirators who are not parties in this appeal. Because no protected interest of the appellants was implicated by the first warrant, we need not assess its constitutionality.

In contrast, each of the subsequent Facebook warrants targeted accounts that belonged to at least one appellant. The second warrant targeted Luis Gonzales's accounts. The third warrant targeted Moises Zelaya-Veliz's account. And the fourth warrant targeted accounts belonging to Jose Molina-Veliz, Santos Gutierrez Castro, Jonathan Zelaya-Veliz, and Gilberto Morales. Given this, the government and defense both accepted that the appellants had Fourth Amendment standing to challenge these warrants.

In adopting the litigants' assumption that Fourth Amendment standing exists here, we note that each of the warrants at issue required the disclosure of the appellants' private communications. Most federal courts to rule on the issue have agreed that Facebook and other social media users have a reasonable expectation of privacy in content that they exclude from public access, such as private messages. *See United States v. Bledsoe*, 630 F. Supp. 3d 1, 18 (D.D.C. 2022) (finding the "weight of persuasive authority hold[s] that non-public content held on social media accounts is protected under the Fourth Amendment" and citing cases); *United States v. Chavez*, 423 F. Supp. 3d 194, 201–205 (W.D.N.C. 2019); *United States v. Irving*, 347 F. Supp. 3d 615, 623 (D. Kan. 2018).

Such an approach reflects the consensus of federal courts that private electronic communications are generally protected by the Fourth Amendment, even when transmitted

20

over third-party platforms. *See, e.g.*, *United States v. Wilson*, 13 F.4th 961, 980 (9th Cir. 2021) (holding examination of defendant's email attachments without a warrant violated his Fourth Amendment right to be free from unreasonable searches); *United States v. Hasbajrami*, 945 F.3d 641, 666 (2d Cir. 2019) (assuming for the purposes of the appeal that "a United States person ordinarily has a reasonable expectation in the privacy of his e-mails"); *United States v. Warshak*, 631 F.3d 266, 284–88 (6th Cir. 2010) (holding the Fourth Amendment protects private email communications); *United States v. Richardson*, 607 F.3d 357, 363–64 (4th Cir. 2010) (suggesting that before a government agent searches emails, "probable cause and a warrant [a]re required"); *see also Katz v. United States*, 389 U.S. 347, 352–53 (1967) (finding persons have a protected Fourth Amendment interest in the content of their phone conversations, despite the ability of an operator to listen in); *Ex parte Jackson*, 96 U.S. 727, 733 (1877) (holding that the contents of postal letters are entitled to Fourth Amendment protection, despite the fact that letters are entrusted to intermediaries).

It cannot be the rule that the government can access someone's personal conversations and communications without meeting the warrant requirement or one of the Supreme Court's delineated exceptions to it. The judiciary would not allow such a trespass upon privacy at its core.

## B.

We thus turn to the appellants' claims that the second, third, and fourth warrants were constitutionally deficient. Their first contention is that the district court erred in

21

denying their motions to suppress because the Facebook warrants were issued without probable cause. We disagree.

1.

The Fourth Amendment requires that warrants be supported by probable cause. U.S. Const. amend. IV. There is probable cause when, "given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. Courts thus must not invalidate a warrant based on "a hypertechnical, rather than a commonsense," interpretation of the warrant affidavit, *id.* at 236, but must instead take into account "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Gates*, 462 U.S. at 231).

Reviewing courts must determine whether "the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236 (internal quotations omitted); *see also Massachusetts v. Upton*, 466 U.S. 727, 732–33 (1984). In doing so, "[w]e afford initial probable cause determinations 'great deference' when, as here, a 'neutral and detached magistrate' finds probable cause to support a warrant." *United States v. Orozco*, 41 F.4th 403, 407 (4th Cir. 2022) (quoting *Gates*, 462 U.S. at 236, 240).

2.

22

The magistrates who approved the three Facebook warrants at issue each had a substantial basis for concluding that the searches would uncover evidence of wrongdoing. They each reasonably determined, based on the information averred in the supporting affidavits, that there was a fair probability that evidence of MS-13's sex trafficking crimes would be found on the appellants' Facebook accounts.

The affidavits all explained how Special Agent Obie's training and experience made him aware that MS-13 uses social media platforms such as Facebook to conduct and communicate about criminal activities, including commercial sex trafficking. The magistrates were well within their discretion to rely on an officer's "assertion of training- and experience-based knowledge" to help substantiate the nexus between the sex trafficking crimes listed by the warrants and the Facebook accounts to be searched. *United States v. Williams*, 548 F.3d 311, 319–20 (4th Cir. 2008). This reliance is particularly appropriate where, as here, the averred facts based on training and experience were substantiated by examples in case law of MS-13 using social media to advance its criminal activities. *See, e.g.*, *United States v. Ruiz*, 623 F. App'x 535, 536 (11th Cir. 2015) (per curiam); *United States v. Juvenile Male*, 269 F. Supp. 3d 29, 38 (E.D.N.Y. 2017); *United States v. Contreras*, 2017 WL 6419136, at *1 (D. Md. Oct. 19, 2017).

The appellants contend that training and experience alone are insufficient to establish a nexus between the location of the proposed search and the alleged criminal activity, citing *United States v. Schultz*, 14 F.3d 1093, 1097–98 (6th Cir. 1994). But far from relying merely on averments about the typical uses of social media by gang members,

23

each affidavit provided copious details linking the appellants' use of Facebook to the sex trafficking enterprise under investigation.

Take first the affidavit supporting the second warrant. This affidavit identified Luis Gonzales as the user behind the five targeted Facebook accounts bearing the name "Luis Figo." It stated that Minor-2 had, during an interview with law enforcement, identified a photo posted by each of the Facebook accounts as depicting someone she called "Luis," whom she explained was an integral participant in her physical and sexual abuse. And it discussed how Luis's credit card had been used to pay for the phone bill of the cell phone recovered on Minor-2's person. Moreover, the affidavit showed Luis's associates in MS-13 using Facebook to discuss the first bat beating of Minor-2. This combination of evidence established that (1) Luis was involved in the sex trafficking of Minor-2; (2) he was operating multiple Facebook accounts under an assumed last name; and (3) his MS-13 associates used Facebook to facilitate Minor-2's trafficking and physical abuse. The affidavit thus provided ample support for the magistrate's determination that there was a sufficient nexus between the five accounts to be searched and the evidence of sex trafficking to be seized.

Next, consider the third warrant. Here too a substantial basis existed for the magistrate's finding, in authorizing the warrant, that probable cause existed to search Moises Zelaya-Veliz's Facebook account. The affidavit provided a detailed description, based on interviews with Minor-2, of how Moises was central to the sex trafficking conspiracy. And, according to the affidavit, the warrant-backed search of Sioni Gonzalez's Facebook account had revealed that Moises used his Facebook account to advance MS-

24

13's other criminal endeavors. These endeavors involved the use of firearms, and were depicted through the transmission of photographs of firearms, illegal drugs, and gang signs.

Finally, take the fourth warrant. The magistrate had a substantial basis for concluding that probable cause existed to search the Facebook accounts of the four appellants the warrant targeted. Submitted to the court on February 20, 2020—over ten months into the investigation—the affidavit supporting this warrant provided voluminous information on the sex trafficking conspiracy and directly tied the use of Facebook by each of the four appellants to their criminal activities. In doing so, the affidavit made extensive use of the Facebook records produced pursuant to the previous warrants.

For Santos Gutierrez Castro, the affidavit provided Facebook transcripts of his conversations coordinating prostitution customers for Minor-2 and soliciting sexually explicit photos and in-person sexual acts from Minor-2 in exchange for money and drugs. For Jose Molina-Veliz, the affidavit transcribed Facebook conversations consisting of sexual advances towards Minor-2 and Minor-3 during the period that the two girls were being exploited by MS-13. For Jonathan Zelaya-Veliz, it shared evidence of his discussing with his brother Moises the sex trafficking and exploitation of Minor-2. And for Gilberto Morales, the affidavit disclosed that he partnered with Luis Gonzales in trafficking Minor-2, that he sexually abused Minor-2, and that he sought regular contact with Minor-2 during her confinement and exploitation.

Contributing further to the affidavits' credibility and the establishment of probable cause was the information that Minor-2 bravely relayed to law enforcement during her post-recovery interviews. Her decision to share the details of her abuse with the authorities

25

was an act of genuine courage. Providing information to law enforcement on gang-related offenses can subject a victim to retribution and revenge, and multiple MS-13 members had threatened Minor-2 with death for her and her family. The strength with which this thirteen-year-old victim shared the grim facts about her abuse is therefore firm evidence of her credibility. Indeed, the circumstances under which Minor-2 talked to law enforcement make the information she shared tantamount to statements against interest, which the Federal Rules of Evidence regard as indicative of reliability. *See* Fed. R. Evid. 804(b)(3) (stating that certain statements are so contrary to a declarant's own interest that a reasonable person would only make such statements if they believed them to be true).

The warrant affidavits in this case were well-sourced. They incorporated information from a reliable witness, the experience of an agent well-versed in the workings of MS-13, and—with each successive warrant—an increasingly incriminating chain of messages that tethered successive Facebook accounts to the larger conspiracy. In light of the thoroughness of the affidavits, the magistrates quite properly found probable cause.

C.

Next, the appellants contend the Facebook warrants were insufficiently particularized in two ways. First, they claim the scope of the warrants should have included fewer categories of data from the Facebook accounts. Second, they claim that the timeframe of the warrants should have been limited to include only information during the trafficking of Minor-2 instead of information from before and after that period.

1.

26

The Fourth Amendment requires that warrants "particularly describ[e] the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. This requirement stems from our Founders' disdain for "the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014); *see also Marron v. United States*, 275 U.S. 192, 195–96 (1927). By having to state with particularity the scope of the authorized search, a warrant prohibits the government from having "unbridled discretion to rummage at will among a person's private effects." *Arizona v. Gant*, 556 U.S. 332, 345 (2009); *see also Andresen v. Maryland*, 427 U.S. 463, 480 (1976); *United States v. Blakeney*, 949 F.3d 851, 861 (4th Cir. 2020).

At the same time, the particularity requirement is not a "constitutional straight jacket," *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010), and it should be not read to create "a too-cramped understanding of the scope of a proper warrant." *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020). Because the particularity requirement is "a pragmatic one," "[t]he degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." *United States v. Cobb*, 970 F.3d 319, 327 (4th Cir. 2020) (quoting *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981)).

2.

With this background in mind, we turn to the appellants' argument that the warrants were insufficiently particularized with respect to the scope of the information that they required Facebook to disclose. The warrants compelled Facebook to turn over a wide swath

27

of personal information attached to the accounts, including all private communications, most user activity, and, in the case of the latter two warrants, all location information. But each warrant "'identif[ied] the items to be seized by reference to [the] suspected criminal offense[s],'" namely, 18 U.S.C. §§ 1591, 1952, 2422(a), and, with respect to the latter two warrants, also 18 U.S.C. § 2423(a). *Cobb*, 970 F.3d at 329 (quoting *Blakeney*, 949 F.3d at 863). So while the warrants authorized the government to search all of the information disclosed by Facebook, they only permitted the subsequent seizure of the fruits, evidence, or instrumentalities of violations of enumerated federal statutes. We have previously found that a warrant's particularity is bolstered where, as here, the scope of the seizure it authorized was limited to evidence of enumerated offenses. *See id.* at 328–29; *Blakeney*, 949 F.3d at 863; *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994). The warrants in this case thus appropriately "confined the executing officers' discretion," *Cobb*, 970 F.3d at 328, by restricting them from rummaging through the appellants' social media data in search of unrelated criminal activities.

This distinction between what may be searched and what can be seized counsels the government to execute social media warrants through a two-step process. This process—whereby the government first obtains a large amount of account data then seizes only the fruits, evidence, or instrumentalities of enumerated crimes—is crucial to the validity of social media warrants. As in a search of a house, the officers searching the Facebook account data at issue necessarily encountered a host of irrelevant materials. But, just like in a house search, the officers were authorized to seize only the fruits, evidence, or instrumentalities of the crimes for which they had established probable cause.

28

The validity of this two-step process is acknowledged by Federal Rule of Criminal Procedure 41(e)(2)(B) and its commentary, which permit officers, in searching electronically stored information pursuant to a warrant, to "seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant." Fed. R. Crim. P. 41(e)(2)(B) Committee Notes on Rules—2009 Amendment. While "the Fourth Amendment generally leaves it 'to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant,'" *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020) (quoting *Dalia v. United States*, 441 U.S. 238, 257 (1979)), the two-step process, as laid out in Rule 41, helps to mitigate particularity concerns in the social media warrant context. *See United States v. Mercery*, 591 F. Supp. 3d 1369, 1382 (M.D. Ga. 2022) (noting the "general practice for agents to comply with Rule 41 by creating a two-step process—the 'search' wherein the warrant will compel the third party to produce a broad array of electronic information, and the 'seizure' wherein the warrant will authorize the seizure of [] specified information.").

Contrary to the appellants' claims, this two-step process is not toothless. Rule 41 and the terms of the warrants at issue ensured that the government executed the warrant in a reasonable manner. The district court retained the authority to determine that prolonged retention of non-responsive data by the government violated the Fourth Amendment. *See* J.A. 120 (finding that "the Government was authorized and is authorized to proceed with this two-step procedure, and that at this point it cannot be said that the time period to complete that process has expired."). This authority derives from the fact that, "[i]n the

29

[warrant] execution context, as elsewhere, Fourth Amendment reasonableness kicks in." *Cybernet*, 954 F.3d at 168. Courts have applied this reasonableness standard to suppress evidence when the government delayed unreasonably in sifting through social media warrant returns for relevant evidence. *See, e.g.*, *United States v. Cawthorn*, 2023 WL 5163359, at *5–7 (D. Md. July 13, 2023) (finding Fourth Amendment violated when government waited two years after executing warrant to review social media account data and did not justify delay). These safeguards help ensure that, despite the large scope of information that the warrants here returned, the searches and seizures they authorized were not insufficiently particularized.

The wide-ranging nature of the sex trafficking conspiracy under investigation further mitigates any concern that the scope of the warrant was impermissibly broad. The FBI was investigating the multi-month sex trafficking of at least three underage girls by force and coercion. By the time the first warrant at issue was sought, that investigation had produced evidence that a host of gang-affiliated suspects had helped sex traffic the minors, and many more had engaged in illegal sexual activity with them. And these were not just "ordinary" gang members. The suspects were members of or otherwise affiliated with MS-13, a transnational criminal organization that "defined its primary mission as killing rivals" and that committed numerous murders across the United States. *See United States v. Perez-Vasquez*, 6 F.4th 180, 187 (1st Cir. 2021). A reasonable inference from the evidence in the warrant affidavits was that the sex trafficking conspiracy was ongoing, as at least some of the suspects appeared willing to sex traffic minors under the threat of death as a matter of course so that they could fund their lifestyles and MS-13's operations.

Moreover, the affidavit showed how the conspirators were using Facebook extensively to communicate with co-conspirators, victims, and customers in furtherance of the conspiracy. Under such circumstances, it did not violate the Fourth Amendment's particularity requirement for law enforcement to obtain detailed Facebook user activity data on the sex trafficking suspects. *See, e.g.*, *United States v. Allen*, 2018 WL 1726349, at *2, *6 (D. Kan. Apr. 10, 2018) (holding Facebook warrant that produced 28,000 pages of records was sufficiently particularized in the context of an investigation into a complex criminal conspiracy to use a weapon of mass destruction); *United States v. Daprato*, 2022 WL 1303110, at *7 (D. Me. May 2, 2022) (rejecting particularity challenge to a warrant that compelled disclosure of broad array of Facebook account data to help "reveal [a defendant's] additional connections with the codefendants or victims"). The sheer magnitude of the sex trafficking conspiracy here justified a concomitant breadth in the scope of the warrants, particularly as the seizures they authorized were limited to evidence of the specified offenses for which probable cause existed.

3.

We next consider the appellants' claim that the timeframe of the warrants was fatally overbroad. The appellants contend that the second warrant was insufficiently particularized because it had no temporal limitation, and that the third and fourth warrants were insufficiently particularized because their temporal limitations far exceeded the two-month period of time during which Minor-2 was sex trafficked. Other courts have found that a temporal limitation can help particularize warrants that authorize the search and seizure of Facebook account data. *See, e.g.*, *Chavez*, 423 F. Supp. 3d at 207; *see also United States v.*

31

*McCall*, 84 F.4th 1317, 1328 (11th Cir. 2023) ("By narrowing a search to the data created or uploaded during a relevant time connected to the crime being investigated, officers can particularize their searches to avoid general rummaging.").

We start with the third and fourth warrants, both of which were timebound. They limited the period of disclosure from January 2018 to their respective dates of service. This timeframe was appropriately particularized as (1) the affidavits suggested that Minor-2 had been sexually abused by affiliates of MS-13 starting during or before June 2018; (2) Minor-2's abuse was part of a broader sex trafficking conspiracy involving multiple minors, including Minor-3, who was already in close contact with MS-13 members before she met Minor-2 and who may have already been sex trafficked by them; (3) each affidavit explained how gang members involved in a sex trafficking conspiracy often use social media to discuss the conspiracy before, during, and after its execution; (4) multiple appellants continued to use Facebook to message Minor-2 after she was recovered by law enforcement in October 2018; and (5) it was appropriate for the magistrates to infer from the affidavits that the targeted MS-13 members and affiliates were engaged in what the district court called an "extensive ongoing interstate criminal enterprise of uncertain beginnings." J.A. 115. The extensive nature of the conspiracy being investigated in this case meant that "less temporal specificity [wa]s required here than in other contexts where evidence can more readily be confined to a particular time period." *United States v. Manafort*, 323 F. Supp. 3d 768, 782 (E.D. Va. 2018). As the Tenth Circuit has rightly noted, "[w]arrants relating to more complex and far-reaching criminal schemes may be deemed legally sufficient even though they are less particular than warrants pertaining to

more straightforward criminal matters." *United States v. Cooper*, 654 F.3d 1104, 1127 (10th Cir. 2011).

The second warrant that targeted Luis Gonzales's Facebook accounts, on the other hand, lacked a temporal limitation. This total lack of a time period in a social media warrant raises a problem. As our society moves further into the digital age, Facebook and other social media accounts are beginning to contain decades of personal information and communications, often going back to an account holder's early teenage years. These social media accounts, much like cell phones, frequently contain "a broad array of private information never found" during a traditional search of a home. *Riley*, 573 U.S. at 397; *see also United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) ("Where a warrant authorizes the search of a residence, the physical dimensions of the evidence sought will naturally impose limitations on where an officer may pry[.] . . . Such limitations are largely absent in the digital realm[.]"). That is why one court has stated that Facebook warrants pose "an especially potent threat to privacy" because they can "provide[] a single window through which almost every detail of a person's life is visible." *United States v. Shipp*, 392 F. Supp. 3d 300, 307–08 (E.D.N.Y. 2019).

Moreover, the imposition of a temporal limitation on the information that Facebook must disclose does not pose the administrability concerns that an analogous limitation would pose in a traditional search of a home. That is because it is possible for Facebook to filter data by time frame before disclosing it to the government, while an officer searching a home often has no idea when each item was last used. *See McCall*, 84 F.4th at 1328.

33

Thus, "a time-based limitation [is] both practical and protective of privacy interests" in the context of social media warrants. *Id.*

We need not go so far as to mandate a temporal restriction in every compelled disclosure of social media account data for the simple reason that we cannot anticipate all future circumstances. Nor do we invalidate the warrant-backed search and seizure of Luis Gonzales's Facebook account information. Rather, in applying the Fourth Amendment to novel questions posed by digital technology, we find it advisable to proceed with caution. "The judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 759 (2010). We therefore hold that Luis's motion to suppress was properly denied because the good faith exception to the exclusionary rule applies. *See United States v. Leon*, 468 U.S. 897, 922–24 (1984).

Given the unsettled nature of whether a temporal limitation is required on a warrant authorizing the search and seizure of Facebook account data, we cannot say that "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23. Rather, law enforcement here acted pursuant to a warrant that was not "so facially deficient . . . that the executing officers [could not] reasonably presume it to be valid." *Id.* at 922–23. It is axiomatic that "'[c]ourts should not punish law enforcement officers who are on the frontiers of new technology simply because they are at the beginning of a learning curve and have not yet been apprised of the preferences of courts on novel questions.'" *Cawthorn*, 2023 WL 5163359, at \*4 (quoting *Chavez*, 423 F. Supp. 3d at 208). As Special Agent Obie relied on his good faith belief in

the warrant's validity, we hold that the district court did not err in denying the appellants' motions to suppress. We note, however, that future warrants enhance their claims to particularity by "request[ing] data only from the period of time during which [the defendant] was suspected of taking part in the [criminal] conspiracy." *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017).

Our ruling is a narrow one, and we do not greenlight all warrants for and searches of social media data.[3] Because "the ultimate touchstone of the Fourth Amendment is reasonableness," *Fernandez v. California*, 571 U.S. 292, 298 (2014), the validity of any warrant depends on an analysis of the circumstances at issue. This is no less true in the social media context than in a search in the Founders' day.

III.

Finally, Santos Gutierrez Castro claims the district court should have granted his motion for acquittal because insufficient evidence was presented at trial to sustain his convictions. *See* Fed. R. Crim. P. 29. We review the denial of such a motion de novo. *United States v. Gallimore*, 247 F.3d 134, 136 (4th Cir. 2001). If, viewing the evidence in the light most favorable to the prosecution, the guilty verdict at trial was supported by substantial evidence, we are required to sustain it. *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

---

[3] We do not, for example, address the question of whether officers sifting through Facebook account data for the fruits and instrumentalities of sex trafficking could lawfully build a different case under a plain view discovery of a distinct offense.

35

We reject Santos's sufficiency challenge and affirm his convictions. Substantial evidence supported the jury's conclusion that Santos was guilty of (1) conspiracy to engage in sex trafficking of a minor under fourteen or of a minor by force, fraud, or coercion in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(c); (2) sex trafficking of a minor under fourteen or of a minor by force, fraud, or coercion in violation of 18 U.S.C. §§ 1591(a)(1) and 1591(b)(1); and (3) conspiracy to transport a minor in interstate commerce with intent for the minor to engage in prostitution or illegal sexual activity in violation of 18 U.S.C. § 2423(e). The jury heard evidence that Santos harbored Minor-2 in his house for multiple days, had sex with her there despite knowing she was underage, and allowed multiple other men to do the same in exchange for money. The jury also received Facebook records showing that Santos coordinated with co-conspirators to sex traffic Minor-2, including by circulating risqué photos of her and discussing where to transport her so that customers could sexually exploit her.

Santos claims on appeal that "[n]ot one witness testified" that he received anything of value in return for sexual acts by Minor-2. Appellants' Brief at 40. Yet Minor-2 herself testified that, while she was in Santos's home, she heard him telling people over the phone that if they were going to have sex with her, they had to pay $100 per hour. The same day that she overheard this call, Minor-2 was forced to have sex with more than ten men in Santos's home. Santos disputes the validity of this testimony, noting that in Minor-2's initial interviews with law enforcement, she said she did not recall whether Santos received money in exchange for her having sex. But, viewing the evidence in the light most

36

favorable to the prosecution, it was well within the jury's discretion to credit Minor-2's trial testimony.

Beyond Minor-2's testimony, copious Facebook records and interview transcripts support the jury's verdict. Santos himself openly admitted in a *Mirandized* interview with FBI agents that he had engaged in sex with Minor-2, whom he knew was underage, while she was at his house. This admission is substantiated by multiple Facebook conversations between Santos and Minor-2 in which he discussed meeting up with her to have sex. In Facebook conversations between Santos and Jose Molina-Veliz, they talked about the possibility that one of them had impregnated Minor-2. The two also discussed, around the time of Minor-2's second bat beating, meeting up so they could beat Minor-2 on the chest. What's more, Facebook conversations with additional co-conspirators show Santos coordinating the transportation of Minor-2 to different prostitution customers, including one conversation in which he refers to Minor-2 as a female prisoner.

To summarize, the extensive Facebook records presented at trial, combined with Minor-2's testimony and Santos's admissions to the FBI, provided substantial evidence on which the jury was entitled to find him guilty of conspiracy to transport Minor-2 in interstate commerce with the intent that she engage in illegal sexual activity; sex trafficking of Minor-2 as a person under fourteen or by force, fraud, or coercion; and conspiracy to do the same. His was not a close case, and the district court properly denied Santos's motion for acquittal.

IV.

37

As the tragic facts of this case reveal, social media provides an all-too-easy avenue for the coordination of sex trafficking conspiracies. Even more troubling, sex traffickers are able to use social media to lure underage victims into their grasp. The reasonableness standard that is so central to the Fourth Amendment necessitates that we permit the government to thwart these emerging criminal tactics with novel investigatory tools of its own. Warrants for social media data are one such tool, as they empower law enforcement officers to reveal the activities of criminal conspirators, disrupt their illicit plots, and bring them to justice. But while social media warrants can support invaluable police work, as they did in this case, they also provide significant potential for abuse. We cannot read the Fourth Amendment to allow the indiscriminate search of many years of intimate communications. And because of the inherent interconnectedness of social media, permitting unbridled rummaging through any one user's account can reveal an extraordinary amount of personal information about individuals uninvolved in any criminal activity.

It is not only courts that are struggling to strike a balance between privacy and security in the rapidly changing digital domain, but society as a whole. When criminal offenders use social media to organize their enterprises and evade detection, it would seem unreasonable to disable law enforcement from using those same media to apprehend and prosecute them. To hold otherwise would arbitrarily tip the scales away from law and justice for the benefit of increasingly sophisticated criminal schemes. But at the same time, there comes a point when the Fourth Amendment must emphatically yell STOP, lest we render obsolete the hallowed notion of a secure enclave for personal affairs.

38

## V.

For the foregoing reasons, the judgment of the district court is in all respects affirmed.

*AFFIRMED.*