**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 6, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | No. 24-1333 |
| KIMBERLEY ANN TEW, a/k/a Kimberley Vertanen, | |
| Defendant-Appellant. | |

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | No. 24-1465[*] |
| MICHAEL AARON TEW, | |
| Defendant-Appellant. | |

_____

**Appeals from the United States District Court
for the District of Colorado
(D.C. Nos. 1:20-CR-00305-DDD)**

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument in Appeal No. 24-1465. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). That appeal is therefore submitted without oral argument.

Justin A. Lollman of GableGotwals, Tulsa, Oklahoma, for Defendant-Appellant Kimberley Ann Tew.

Kari S. Schmidt, Wichita, Kansas, for Defendant-Appellant Michael Aaron Tew.

Rajiv Mohan, Assistant United States Attorney (Peter McNeilly, United States Attorney, with him on the briefs), Denver, Colorado, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **McHUGH** and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

Michael Tew made a living providing financial advice to large companies. When one such company was forced into bankruptcy, it hired Michael to help. And he did.

Michael's wife, Kimberley Tew, traded cryptocurrency and liked to gamble. But she wasn't always profitable in her endeavors. When she ended up financially underwater, her creditors came calling. They didn't only call Kimberley and Michael; they also called Michael's employer, which eventually led to Michael's firing.

But before Michael was fired, the Tews had found another way to cash out. Michael and Kimberley – along with an accomplice on the inside – had begun filing falsified invoices for nonexistent vendors. They kept this up for

2

years and received payments for false invoices to the tune of $5 million. Eventually, federal law enforcement agents got wise to the scheme.

The couple was charged in a 60-count indictment. They went to trial, where they attempted to blame each other. It did not work out for them – both Michael and Kimberley were convicted by the jury. The district court then sentenced Michael to 42 months' imprisonment and more than $6 million in restitution. Kimberley was sentenced to 48 months' imprisonment and ordered to pay more than $5 million in restitution.

They appeal separately. Because the cases involve overlapping facts and circumstances, we have consolidated them for the purposes of this opinion. In his appeal, Michael alleges he was prejudiced by going to trial alongside Kimberley. In her appeal, Kimberley raises a similar issue and additionally claims that the Government unreasonably seized her cell phone's data from a third-party cloud computing provider, Apple.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the judgments in both cases.

**I**

**A**

In 2015, National Air Cargo (National) lost a multi-million-dollar civil judgment. In response, it entered Chapter 11 bankruptcy and began looking for new investors. To help with the latter goal, National hired Michael Tew.

Michael was well-credentialed and highly recommended. National initially hired Michael's company, Sand Hill, as a contractor. Although Michael was sole owner of Sand Hill, his wife, Kimberley, also worked there. National paid Sand Hill $25,000 per month, plus performance incentives. Impressed by Michael's work, National soon named him its Chief Financial Officer (CFO).

Their employment arrangement would not last. But, before it ended, National issued its new CFO a corporate credit card. In July 2018, the card began incurring significant – and unusual – charges. In nine days, the card balance climbed by $44,000. The company presumed the card stolen. But, when National's CEO asked about the charges, Michael said that Kimberley was responsible. She had personal debt related to cryptocurrency and had run up charges on the card to pay her creditors. On a call with the CEO, Michael handed the phone to Kimberley. Through tears, she apologized and promised to pay the balance. Michael kept his job.

National's problems continued. In September 2018, the company began receiving calls from a man stating that Michael owed him money. The caller became aggressive. Then, the company's CEO began receiving calls at his home. His wife and college-aged daughter began receiving text messages, threatening to superimpose their faces on nude images and post them online if debts were not paid. When confronted, Michael again blamed

4

Kimberley. He said that she had hired the caller to create computer software and hadn't paid him. Kimberley again apologized. This time, Michael was fired.

National was not yet out of the woods when it came to the Tews. Michael had already begun to defraud the company in a manner that would later come to light. Shortly before he was fired, Michael sought an advance on his salary. The company's comptroller, Jonathan Yioulos, said he could not do it. Michael then sent Yioulos a fraudulent invoice and said: "Just pay this." No. 24-1333, Supp. R. I at 271. Yioulos processed the invoice, and Michael was paid the amount falsely claimed to be due.

After Michael was fired, the scheme progressed in scale and sophistication, even though the basic idea remained the same. Michael would send invoices to National for goods or services that had not been provided. Often, those invoices would list false companies, or third parties recruited by Michael and Kimberley as the provider of services. Yioulos would then pay the invoices from National's accounts.

Kimberley had accrued significant debt from gambling and engaging in cryptocurrency speculation. To encourage Yioulos' participation, Kimberley offered him Bitcoin. Michael offered Buffalo Bills season tickets to Yioulos. They both offered to pay off Yioulos' student loans. Kimberley could also be unrelenting. If Yioulos became reticent, Kimberley would text

5

or call to encourage or harangue him. When Yioulos was slow to send money, Kimberley threatened to have Michael report him so Yioulos would lose his accountant's license. When Yioulos blocked her phone number, Kimberley texted him from a new number. Over the course of approximately two years, this fraudulent scheme drained more than $5 million dollars from National's coffers.

## B

National is a government contractor, and eventually the Tews' scheme came to the Government's attention. On July 5, 2020, FBI and IRS agents conducted a consent search of National's records. Two days later, National fired Yioulos. Two FBI agents waited for him outside the office. Yioulos consented to an interview and inculpated Michael and Kimberley. As the agents sat by recording, Yioulos called Michael. The next day, Yioulos made another controlled call to Michael. Then, agents arrested Michael on a warrant issued with a criminal complaint. He agreed to cooperate and met with Government agents to make a proffer.

In the initial proffer meeting, the Government agreed that Michael did not have to answer questions that may implicate Kimberley. Nonetheless, Michael repeatedly inculpated Kimberley in his descriptions of the fraud. He told agents that Kimberley: had the sophistication to create digital phone numbers, kept the books for Sand Hill, received funds from a

third party assisting with the fraud, and decided in which bank account embezzled funds would be deposited. Two weeks later, Michael sat down with the FBI for a second proffer meeting. This time, his proffer agreement provided that he would need to answer questions about Kimberley's involvement. Michael's statements at that meeting further inculpated his wife.

Kimberley later sat down for her own proffer with the Government. Although her proffer agreement provided that she need not answer questions that would implicate Michael, she nonetheless did so. She told agents that Michael: agreed with Yioulos not to provide her profits from the scheme; was "an idiot" because he "literally stole money from the government," No. 24-1465, R. IV at 876; and he had withheld information in his proffer by "play[ing] games with answering questions," *id.* at 878.

Following Michael's second proffer, he also agreed to allow law enforcement to copy the data and contents of his two iPhones. He met the agents at a store near his downtown Denver apartment. While agents were making the copies, Kimberley arrived. She told Michael to leave without allowing the agents to complete the download. Agents heard her say that she had "already wiped most of" the phones' contents. No. 24-1333, R. III at 188. Days later, agents executed a search warrant at the Tews' apartment. The warrant authorized agents to seize Kimberley's iPhone. However,

7

Kimberley was not home at the time, so the agents were not able to seize her phone.

Instead, the agents applied for a search warrant to be served on Apple, Inc. The warrant application included a description of the property to be searched at Apple, the information to be disclosed by Apple, the information to be seized by the Government, and – finally – an affidavit in support of the application. The application noted that it (and the supporting affidavit) had been reviewed by an Assistant U.S. Attorney. A federal magistrate judge approved the application and issued the search warrant. The magistrate judge signed both the application and the warrant itself. The warrant application and supporting affidavit were signed by FBI Special Agent Sarah Anderson. Agent Anderson did not execute the search warrant. Instead, IRS Special Agent Lisa Palmer executed the warrant. Although Agent Palmer did not draft the warrant affidavit, she did draft applications and affidavits for other warrants in the same investigation of the Tews.

The warrant executed by Agent Palmer incorporated two attachments. The first, Attachment A, identified the Apple account that was subject to the warrant. The second, Attachment B, was separated into sections. The first section detailed information to be disclosed by Apple. For example, it stated that Apple was to provide "[a]ll records or other information" that would identify the account's user and the devices used to

access the account. No. 24-1333, R. III at 198. It also stated that Apple was to provide the "contents of all emails" and "all instant messages associated with the account" between May 1, 2018, and September 17, 2020. *Id.* Additionally, it required disclosure – without any time limitation – of all photos stored on the account and all locations where the account was accessed.

Once Apple had turned over the information detailed in Attachment B's first section, the warrant authorized the Government to seize a certain subset of that information. Under the heading "[i]nformation to be seized by the government," the warrant stated that it applied to "[a]ll information described above in Section I that [sic] fruits, evidence and/or instrumentalities of violations of 18 United States Code §§ 371, 1343, 1349, 1519, 1956 and 1957 (the 'Target Offenses') since May 1, 2018, including" seven subcategories of information, set out in paragraphs (a) through (g). No. 24-1333, R. III at 199–200. Paragraphs (a), (c), (d), (e), and (f) contained reference to the "Target Offenses." The others did not. Only paragraph (a) referenced National or a scheme to defraud it.

## C

The investigation ultimately led to criminal charges levied against Yioulos, Kimberley, and Michael. Because it is relevant to claims raised in

this appeal, we now detail the procedural history of their respective cases, including the progression of their representation by counsel.

On July 8, 2020 – the same day as Yioulos' second recorded phone call – agents arrested Michael on a complaint alleging a single count of conspiracy to commit money laundering, 18 U.S.C. § 1956(h). The court appointed an assistant federal public defender to represent Michael.

Through his appointed counsel, Michael then notified the district court that he had reached an agreement with the Government and intended to plead guilty to a one-count information. Before he could enter a plea, however, Michael wrote a letter to the district court stating that he had fired his appointed attorney. In his letter to the court, Michael stated on the one hand that the negotiated plea "itself includes misrepresentations of the facts of the case." No. 24-1333, R. I at 100. But, on the other hand, he said that he remained "willing to plead and cooperate with the Government as has always been the case." *Id*. In response to this letter, the federal defender moved to withdraw from the representation. The district court granted the federal defender's motion, appointed a Criminal Justice Act (CJA) panel attorney to represent Michael, and vacated the change of plea hearing. Two months later, Michael withdrew his notice of intent to plead guilty.

The Government next obtained and filed an indictment naming Michael, Kimberley, and Yioulos as codefendants. The indictment contained sixty counts in total:

- One count of conspiracy to commit wire fraud, 18 U.S.C. §§ 1343, 1349, naming Michael, Kimberley, and Yioulos;

- Thirty-nine counts of wire fraud and aiding and abetting, 18 U.S.C. §§ 2, 1343, all naming Michael and Yioulos, and seven also naming Kimberley;

- One count of conspiracy to commit money laundering, 18 U.S.C. §§ 1956(h), 1957, naming Michael and Kimberley;

- Fifteen counts of money laundering, 18 U.S.C. § 1957, fourteen naming Michael, four also naming Kimberley, and one naming Kimberley alone; and

- Four counts of tax fraud, 26 U.S.C. § 7203, all naming Michael alone.

After the indictment was filed, yet another attorney entered an appearance, this time retained and on behalf of both Michael and Kimberley. Michael's CJA counsel contemporaneously moved to withdraw. The Government soon moved for an inquiry into the propriety of the joint representation. *See* Fed. R. Crim. P. 44(c)(2). In its motion, the Government argued that Michael and Kimberley may have adverse interests in

11

presenting "strategies involving blame-shifting" and "pointing to relative culpability." No. 24-1333, R. I at 167.

The district court held a hearing on the motion, at which Michael and Kimberley were both present. At the hearing, the court explained to Michael and Kimberley that, *inter alia*, "[t]he best defense for one defendant sometimes can be to say that while the other defendants were guilty, I didn't do it. A lawyer representing two defendants can't effectively make that sort of argument." No. 24-1333, R. V at 321–22. Michael and Kimberley both said they understood the court's warnings. In response to the court's questioning, the couple's new lawyer said that he would be able to effectively represent the couple despite the potential for conflicts. The lawyer said:

> Well, Your Honor, first they're husband and wife, and they share a sacred bond of love for each other. I, after looking at this case, think that I can effectively represent them without these types of conflicts occurring.
>
> * * *
>
> I think the stronger defense here, without saying more, is they stand as husband and wife. I've discussed it extensively with my clients. We've talked to them about the law and potential conflicts and, you know, I've explained to them what would happen here today. I'm confident that we can move forward with a strong defense with this married couple who love each other and without these conflicts arising.

*Id.* at 323.

The court noted that Kimberley's involvement in the case had apparently led a prior attorney to withdraw from representing Michael. In response, the retained attorney said:

> I think my approach to the defense is different and is, you know, based on their strong love and unity and telling the story of what actually happened here instead of them being splintered and being forced to turn against each other and destroy this family or whatever. I have a different approach to defense than prior counsel, and that's no judgment or comment on what prior counsel was doing, Your Honor.

*Id.* at 325.

At the same hearing, the Government stated that Michael and Kimberley had each previously "provided information that inculpate[s] the other." *Id.* at 327. Conflicts, in the Government's view, were a "seeming inevitability." *Id.* at 329. Nonetheless, the district court deferred to Michael and Kimberley's acknowledgement and waivers of conflicts and allowed the joint representation. The court simultaneously granted the CJA attorney's motion to withdraw.

This joint representation would not last. When the couple failed to pay their retained attorney's bills, the lawyer moved to withdraw. The motion and accompanying papers noted that attorney-client communication had broken down. Newly retained counsel then entered an appearance, again on behalf of both Michael and Kimberley.

13

While still jointly represented, Kimberley (but not Michael) moved for severance of the cases. She argued that severance was warranted for two reasons. First, her constitutional right to confrontation was imperiled because Michael had made statements that incriminated her and on which she would not be able to cross-examine him because of his Fifth Amendment right not to testify. Second, because Michael had been charged with many more counts, evidence admitted against Michael was likely to be unfairly prejudicial to her. At a hearing on the severance motion, the Government argued that joint representation, not a joint trial, posed the real problem. The court noted that joint representation was "risky" and "urge[d]" the Tews to think through their decision. No. 24-1333, R. IV at 133.

The district court denied Kimberley's motion for severance. It reasoned that Kimberley was unlikely to encounter a confrontation clause issue because the challenged statements could be admitted subject to a limiting instruction and redactions. And the court reasoned there was little likelihood of unfair prejudice because Kimberley had failed to point to any evidence that would be admissible at a joint trial but not at an individual trial.

Kimberley and Michael also filed a joint motion seeking suppression of evidence collected pursuant to several search warrants, including the search warrant issued to Apple that is now challenged by Kimberley on

14

appeal. The district court denied the suppression motion, ruling that the warrant was sufficiently particular and – in any event – the good faith exception applied.

When the couple ran out of money to pay their legal bills, their privately retained attorney was then appointed by the court pursuant to the CJA so that he could continue the representation. He then moved the court to appoint separate counsel for one of the defendants. In the motion, counsel noted that his clients were considering testifying at trial and that both Tews had provided "significant proffers" inculpating one another, a circumstance of which the court was already well-aware given its previous hearing and discussion with the Tews about the risks of joint representation. No. 24-1333, R. I at 742. The district court initially ordered counsel to continue representing Michael and appointed new and separate counsel for Kimberley. Soon, though, the court also appointed new and separate counsel for Michael, given the risk of a conflict between Michael's and Kimberley's interests at trial.

After the Tews settled on separate court-appointed counsel for each of them, on February 5, 2024, the district court seated a jury for the first day of trial. Nearly four years had passed since Michael's arrest, and a full three years had passed since the indictment issued. Kimberley and Michael, separately represented, sat at the defense tables. Yioulos would appear at

15

the trial only as a cooperating witness – in the intervening years, he had pleaded guilty to wire fraud and conspiracy to commit wire fraud.

## D

At opening statements, Kimberley's counsel did not pull punches. His very first words to the jury made clear that Kimberley's defense would be adverse to her husband. He said: "This case is about a scheme concocted and executed by Michael Tew and Jon Yioulos that resulted in millions of dollars of loss to National Air Cargo." No. 24-1333, Supp. R. I at 182. Counsel elaborated that jurors should "not lump these two people" – Michael and Kimberley – "together." *Id.* at 184. Kimberley, by her attorney's telling, did not control the bank accounts through which funds flowed, was not accused in the same number of counts, and was not involved in the scheme he conceded Michael and Yioulos conducted.

Before the first witness took the stand, Michael's attorney approached the bench and moved for severance of their trials. She argued:

> Ms. Tew's counsel just opened implicating Michael Tew, our client, pointing the finger at him, saying his name is all over the bank accounts, all of the money went back to him, Mr. Tew, Michael Tew's lifestyle, that he was providing for the family was the motivation. You just heard the entire opening from Ms. Tew, which points the fingers at Mr. Tew and Jon Yioulos. This is so antagonistic, at this point, that I don't believe that Mr. Tew is going to get a fair trial, based on his wife's counsel pointing the finger at him, and so that's the basis of my motion.

*Id.* at 190.

16

Kimberley's counsel did not then again move for a severance of her trial. Rather, she confirmed that she and her co-counsel would "defend the case exactly as we opened, which is to suggest that the conspiracy was between Michael Tew and Jon Yioulos." *Id.*

The Government opposed severance. It argued: that the issue was waived; in the alternative, that the district court had implicitly decided the issue in denying Kimberley's pre-trial severance motion; and that antagonistic defenses alone are not sufficient to warrant severance.

The district court, addressing Michael's counsel, stated that "this doesn't seem like some surprise bombshell that you couldn't have thought out before." *Id.* at 193. The court additionally reasoned that if it granted severance, both individual trials would have to be rescheduled. But the court took the motion under advisement and asked the parties to submit simultaneous briefs after the close of the third day of trial.

The Government then called its first witness to the stand, Yioulos. Direct examination spanned the rest of the first day, all the second day, and until mid-morning on the third day of trial. Then, Michael had the first opportunity at cross-examination. His attorney drew out a theme that Kimberley had some degree of control over Michael, which she used to drive the conspiracy. This line of questioning relied on Yioulos' statements to law

17

enforcement. For example, here is an exchange between Michael's counsel and Yioulos:

> Q Do you recall telling agents, on July 7th, 2020, that, quote, It's almost like this one woman had us both by the balls, and we were kind of – we were both kind of helpless?
>
> A Yes.
>
> Q What did you mean?
>
> * * *
>
> [A] I felt like if I tried to do anything, like go to the authorities or anything of that nature, I felt like I was in so deep that I was still going to get myself in trouble, and that behind the scenes the only person who really wanted money to go out still, was Kimberley.

*Id.* at 533–34.

Occasionally while testifying, Yioulos refreshed his recollection with transcripts of his prior statements. Kimberley's attorney then crossed Yioulos and the Government redirected the witness before the court recessed for the day.

The next morning, Kimberley's attorney orally "supplement[ed]" her pre-trial severance motion. She argued that Michael's cross-examination of Yioulos "put our defense of Ms. Tew directly at issue with the defense that they are running for Mr. Tew." *Id.* at 696. Because Kimberley's defense turned on a lack of knowledge, Michael's defense that Kimberley was directing the scheme put the defendants in "direct conflict," she argued. *Id.*

18

at 697. Beyond "supplement[ing]" the motion and "mak[ing] th[e] record," Kimberley's attorney did not seek a ruling on the issue. *See id.*

The court did not then rule on severance. Instead, it acknowledged Kimberley's counsel's supplement of the record and asked if any attorneys had yet filed written briefing on the issue. None had. Michael's counsel asked for additional time, which the court granted. The Government provided oral argument, and the court asked attorneys to focus their briefing on "why these [defenses] are truly antagonistic in the legal sense." *Id.* at 705.

Eventually Michael submitted a brief in which he argued that his motion did not become ripe until opening statements, given that the defendants' conduct did "not reflect[] antagonism." No. 24-1465, R. III at 87. He argued that filing a severance motion at an earlier point would have previewed his strategy and thereby lessened the Government's burden. On the merits, he argued that the Tews' defenses had become mutually exclusive, and the jury would treat Michael's guilt as derivative of Kimberley's defense.

The district court denied Michael's motion. It reasoned primarily that the motion was not timely. On the merits, it reasoned that: the defenses were mere finger-pointing and not mutually exclusive; Michael had not identified a trial right compromised by Kimberley's defense; and judicial

19

economy outweighed any prejudice that might exist. After the trial began, Kimberley did not file a written motion seeking severance.

The Government's presentation of evidence ultimately spanned eight trial days. This evidence included exhibits from Kimberley's Apple account, such as text messages in which Yioulos told Kimberley that he had sent hundreds of thousands of dollars to certain third parties and a shell company. In the same thread, Yioulos wrote: "If any of this gets out, we're all f***ed." No. 24-1333, Supp. R. I at 417 (quotation modified). Other text messages taken from the Apple account stated that Kimberley had sent cryptocurrency to Yioulos as apparent inducement to transfer money out of National's coffers.

At closing argument, the Government pointed again to evidence from the Apple account. In text messages collected from the account, Michael updated Kimberley on Yioulos' false invoice processing. In another message underlined at closing argument, the couple discussed how they could pressure Yioulos to embezzle more of National's money.

Michael's closing argument hit two primary themes: that Yioulos' credibility was undermined by an interest in providing testimony favorable to the Government, and that Kimberley used emotional manipulation to control the conspiracy and fund her gambling habit. Kimberley, according to Michael's argument, was able to cast a "kind of spell" over people like

20

Yioulos. *Id.* at 1764–65. Michael's attorney argued that his client was the "fuel" that Kimberley and Yioulos "destroyed, used up and ravaged" like a wildfire. *Id.* at 1767.

Kimberley's closing argument struck the same tone as her opening statement. The essence of the argument was captured by its first two sentences: "This scheme was conceived, implemented and maintained by two people. Those two people are Jonathan Yioulos and Michael Tew." *Id.* Like Michael, Kimberley attacked Yioulos' credibility. But, by Kimberley's telling, it was her – not Michael – chosen as the scapegoat. And, in Kimberley's view, Michael was "overwhelmingly guilty." *Id.* at 1770.

The district court declined to send one of the wire fraud counts to the jury regarding Kimberley because the parties had simply not addressed it, either with evidence or by argument. The jury additionally acquitted Kimberley of a single count of money laundering. However, it convicted her of the remaining twelve counts charged against her. The jury found Michael guilty on all fifty-nine counts charged.

Later, the court sentenced Kimberley to forty-eight months' imprisonment and ordered $5.05 million in restitution. It sentenced Michael to forty-two months' imprisonment and ordered $6.36 million in restitution along with a $100,000 fine. Michael and Kimberley timely appeal.

## II

On appeal, Kimberley challenges the warrant used to search her Apple account as insufficiently particularized and facially overbroad. Both Kimberley and Michael challenge the district court's denial of their motions for severance. The Government opposes these arguments. Because it involves the pre-trial gathering of evidence that was used at trial, we will first address Kimberley's argument regarding the Apple warrant. Then we address Kimberley and Michael's severance arguments, which are related but which we analyze separately.

## III

The Fourth Amendment allows for only reasonable searches and seizures. U.S. Const. amend. IV. Reasonableness presumptively requires a warrant, save for certain exceptions. And not any warrant will do. It must describe with particularity the things to be searched and seized. *United States v. Palms*, 21 F.4th 689, 697 (10th Cir. 2021). If a warrant is insufficiently particularized, it is not compliant with the Fourth Amendment. *United States v. Otero*, 563 F.3d 1127, 1131–32 (10th Cir. 2009). Generally, the fruits of a warrant that lacks particularity must be suppressed. However, if law enforcement officers who conducted the search relied in good faith on a warrant later deemed invalid, the evidence may be

admitted at trial. *United States v. Leary*, 846 F.2d 592, 606–07 (10th Cir. 1988).

When reviewing the denial of a motion to suppress, we "view the evidence in the light most favorable to the government and accept the district court's factual findings unless they are clearly erroneous." *Palms*, 21 F.4th at 697 (quoting *United States v. Grimmett*, 439 F.3d 1263, 1268 (10th Cir. 2006)). Legal issues such as particularity and the applicability of good faith are reviewed de novo. *United States v. Loera*, 923 F.3d 907, 914–15 (10th Cir. 2019).

Kimberley argues that in seizing the contents of her Apple account, law enforcement relied on an insufficiently particularized warrant. She further argues that the good faith exception does not apply because the warrant is overbroad on its face. The Government responds that the warrant was compliant with the particularity requirement and, alternatively, the good faith exception applies.

We agree with Kimberley that the Apple search warrant was insufficiently particularized in violation of the Fourth Amendment. However, we hold that, in the circumstances of this case, the Government has shown the good faith exception to the warrant requirement applies and thus the evidence from the Apple account did not need to be suppressed and excluded from the evidence presented at trial.

**A**

Our analysis begins with particularity. The Fourth Amendment requires that warrants be founded on probable cause and – relevant here – that they "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement was designed to prevent the use of general warrants that had allowed for "exploratory searches" the Founders thought abhorrent. *Otero*, 563 F.3d at 1132 (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). The particularity requirement provides that "a search warrant must 'describe the items to be seized with as much specificity as the government's knowledge and circumstances allow.'" *United States v. Suggs*, 998 F.3d 1125, 1132 (10th Cir. 2021) (quoting *Leary*, 846 F.2d at 600). "The guiding purpose of this standard is to establish practical guidelines about what can be searched and seized, leaving nothing to the discretion of the officers executing the warrant." *Palms*, 21 F.4th at 698.

"As technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes, [courts have] sought to 'assure [] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (second alteration in original) (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). And the type of warrant at

issue in this appeal, though unforeseen and unknown to generations past, is now common to the modern digital age. This warrant sought electronic evidence from a third-party service provider pursuant to the Stored Communications Act, 18 U.S.C. § 2701, *et seq.* As such, it provided for a two-step process fast becoming familiar to federal courts. *See, e.g., United States v. Scully*, 108 F. Supp. 3d 59, 95 (E.D.N.Y. 2015).

First, the Government served the warrant on the third party-provider – here, Apple. Apple then turned over responsive documents and data pursuant to Attachment B, Section I. In the second step, law enforcement reviewed the disclosed information to determine if it was authorized to be seized by Attachment B, Section II. Courts generally treat this process as authorized by the Federal Rules of Criminal Procedure. *United States v. Zelaya-Veliz*, 94 F.4th 321, 338 (4th Cir. 2024) (citing Fed. R. Crim. P. 41(e)(2)(B)).

In this case, applying this procedure was particularly fraught given the types of data the Government was authorized to review. Apple turned over Kimberley's emails, text messages, photos, historical physical locations, and "[a]ll records pertaining to the types of service used." No. 24-1333, R. III at 198–99. The data in Kimberley's account was not tied to a particular physical device. Instead, it was linked to her use of an Apple

account. Whichever way Kimberley accessed Apple's servers – so long as she logged into her account – her data was made available to the Government.

Although these types of warrants are becoming more common, our Fourth Amendment doctrine lags behind the technological advances that allow for integrated and cloud-based storage of massive amounts of personal data. Which is to say, there is still little precedential authority expounding on the unique challenges raised by such warrants. This court has previously observed:

> The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important.

*Otero*, 563 F.3d at 1132.

Of course, the data warehouses used by service providers like Apple have far greater ability to intermingle personal information than a desktop computer with a floppy disk drive, as was at issue in *Otero*. *See id.* at 1131. So, just as the search of a computer's hard drive is categorically different from the search of a physical file cabinet, *see United States v. Carey*, 172 F.3d 1268, 1275 (10th Cir. 1999), the search of a cloud-based account is itself categorically different from the search of a physical device like a computer or a cell phone.

As we consider the application of the Fourth Amendment to this quintessentially modern technology, caselaw from the Supreme Court and our sister circuits illuminates our analytical path. In *Riley v. California*, the Supreme Court held that law enforcement may not search cell phones incident to arrest. 573 U.S. 373, 385–86 (2014). It distinguished cell phones from other small items like wallets, purses, physical address books, and cigarette packs. *Id.* at 392–93. Cell phone use, the Court observed, is "pervasive[]" and the data contained on phones is "qualitatively different" from what might be found in physical records. *Id.* at 395. Internet search and browsing history "could reveal an individual's private interests or concerns." *Id.* And "[h]istoric location information" can show a person's "specific movements down to the minute, not only around town but also within a particular building." *Id.* at 396. The presence of certain apps in combination on a phone can "together [] form a revealing montage of the user's life." *Id.* At bottom, the Court concluded that "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house." *Id.* Because of the breadth of information contained, the Court reasoned:

> It would be a particularly inexperienced or unimaginative law enforcement officer who could not come up with several reasons to suppose evidence of just about any crime could be found on a cell phone. Even an individual pulled over for something as

27

basic as speeding might well have locational data dispositive of guilt on his phone.

*Id.* at 399.

*Riley* is instructive but not dispositive in this case. There, the Court held only that officers who arrest a person may not search that person's phone as an incident of the arrest. Instead, they must get a warrant. *Id.* at 403. Here, the Government did get a warrant and conducted a search of Kimberley's cloud-based Apple account. In many ways, the search was of her cell phone and then some. The Government was able to access her emails, text messages, files, photos, location data, and records showing which apps she used, not only for a single cell phone, but for every device that she used to access the Apple account. *See* No. 24-1333, R. III at 198–99. So, we proceed with the awareness that the search of the account in question may expose the Government to more information than the search of a typical cell phone, and that both searches are more intrusive than "the most exhaustive search of a house." *Riley*, 573 U.S. at 396.

In *Carpenter v. United States*, the Supreme Court held that the government must generally obtain a warrant supported by probable cause before obtaining cell-site location information (CSLI) from a wireless provider. *See* 585 U.S. at 310, 316. CSLI is location information collected from the phone company whenever a phone connects to a cell tower. The

28

data at issue in *Carpenter* enabled the government to track the defendant

to an area ranging from one-eighth to four square miles. *Id.* at 312. Such

data is "detailed, encyclopedic, and effortlessly compiled." *Id.* at 309. And,

because the data could be accessed retrospectively:

> [P]olice need not even know in advance whether they want to follow a particular individual, or when. Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years[.]
>
>                                \* \* \*
>
> Only the few without cell phones could escape this tireless and absolute surveillance.

*Id.* at 312. Since "[t]hese location records 'hold for many Americans the

"privacies of life,"'" the Court held their access constitutes a search

necessitating a warrant. *Id.* at 311, 316 (quoting *Riley*, 573 U.S. at 403).

*Carpenter*, again, is instructive but not dispositive of the case before

us. The Government indisputably sought and received a warrant based on

probable cause. The issue here – the scope of the warrant – was not at issue

in *Carpenter*. But, important for our analysis is the Court's observation that

the Fourth Amendment guards against infringements on personal privacy

enabled by new technology even where past doctrine might otherwise allow

the Government greater leeway. *See id.* at 304.

Also, Kimberley's challenges to the Apple warrant resonate in the

Founding-era concerns animating the Fourth Amendment's particularity

requirement. Indeed, the Apple warrant empowered Government agents to

29

review years of her communications, physical locations, and other personal information in a manner reminiscent of the "exploratory rummaging" that the particularity requirement was designed to prevent. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). Our sister circuits have also begun to signal their own Fourth Amendment concerns in similar contexts.

The Eleventh Circuit, for instance, expressed constitutional concern with a warrant requiring Facebook to disclose "virtually every type of data that could be located in a [social media] account," including *inter alia* "every IP address [the defendant] had ever logged in from, every photograph she had ever uploaded," and "her entire contact list." *United States v. Blake*, 868 F.3d 960, 966–67, 974 (11th Cir. 2017) (declining to decide whether the Fourth Amendment had been violated because the good faith exception would apply in any event). The Fourth Circuit has similarly warned that the "total lack of a time period in a social media warrant raises a problem." *Zelaya-Veliz*, 94 F.4th at 340. Because social media accounts may "contain decades of personal information and communications" bearing on "almost every detail of a person's life," warrants served in such contexts can "pose 'an especially potent threat to privacy.'" *Id.* (citation omitted) (applying the good faith exception to affirm admission of the warrant's fruits).

Although we find these well-reasoned cases persuasive, we note that the jurisprudence is again not directly transferrable. There, the circuit

30

courts dealt with social media accounts, which we understand to be contained in cloud-based servers like the Apple account at issue here. However, those accounts may contain fewer intimate details of a person's life than the cloud-based accounts at issue here because social media accounts generally do not allow wholesale access to numerous platforms and forms of communication that may be conducted via an Apple account.

With the foregoing caselaw in mind, we apply this doctrine to Kimberley's challenge to the Apple warrant. We first determine that the agent's affidavit did not particularize the warrant. As a general matter, an affidavit may be used to particularize a warrant that might otherwise be lacking. *United States v. Cooper*, 654 F.3d 1104, 1126–27 (10th Cir. 2011). But to do so, "two requirements must be met: (1) the warrant and the affidavit must be attached; and (2) the warrant must expressly incorporate the affidavit." *Suggs*, 998 F.3d at 1135. Neither requirement is met here. The affidavit was attached to and incorporated by reference into the warrant application. But not so regarding the warrant itself. The Government rightly conceded this point at oral argument.

Thus, our analysis of particularity looks to the face of the warrant. The Government argues Attachment B, Section II contained three limiting principles sufficient to particularize the warrant. By the Government's reading, the warrant sought only evidence of certain target offenses, was

31

limited to a date range beginning in May 2018, and sought only evidence "related to the specific conspiracy to defraud National." No. 24-1333, Resp. Br. at 34–36. We disagree.

The most essential language for our analysis appears in the two paragraphs in the warrant following the heading titled "Information to be seized by the government." *See* No. 24-1333, R. III at 199. They state:

> All information described above in Section I that [sic] fruits, evidence and/or instrumentalities of violations of 18 United States Code §§ 371, 1343, 1349, 1519, 1956 and 1957 (the "Target Offenses") since May 1, 2018, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:
>
> a.    All    information,    including    records,    documents, communications, and photographs, regarding violations of the Target Offenses, including information about the planning, motive for, preparation, execution, amendment, concealment, and furtherance of a conspiracy or scheme to defraud National Air Cargo, planning, discussion, motive for, execution, amendment, concealment, and furtherance of a conspiracy to commit money laundering or substantive acts of money laundering, whether through fiat currency or cryptocurrency, and about or showing, planning, or concealing the destruction of records or evidence related to the Target Offenses[.]

*Id.*

This language is followed by six more subcategories of information, set out in paragraphs (b) through (g). Paragraphs (a), (c), (d), (e), and (f) contain reference to the "Target Offenses." The others do not. Only paragraph (a) references National or a scheme to defraud it.

32

We construe search warrants in a "practical and commonsense fashion" and look to their "plain language" and "structural features" to understand what is authorized. *Suggs*, 998 F.3d at 1133–34. The heading before the quoted paragraphs – "Information to be seized by the government" – tells us their purpose. Common sense helps us correct the typographical error. The warrant is authorizing seizure of "[a]ll information described above in Section I [which are] fruits, evidence and/or instrumentalities of violations of [the Target Offenses] since May 1, 2018." We thus understand the primary focus of this subsection to be limited at most by the enumerated target offenses and the start date of the conspiracy.

The introductory paragraph that lists the information to be seized refers to information described in subparagraphs (a) through (g). However, rather than limit the introductory paragraph, these subparagraphs provide non-exhaustive examples of the types of information captured by the introductory paragraph. *See United States v. Porter*, 745 F.3d 1035, 1046 (10th Cir. 2014). "When a definitional section says that a word 'includes' certain things, that is usually taken to mean that it may include other things as well." *Id.* (quotation omitted) (construing statutory text). Here, the introductory paragraph authorizes seizure of information "including" that information enumerated in paragraph (a). And paragraph (a) itself authorizes seizure of information "including" a scheme to defraud National.

So, although paragraph (a) does reference a scheme to defraud National, this is only one type of information that falls within the introductory paragraph's scope. The reference to National does nothing to limit paragraphs (b) through (g), much less the introductory paragraph itself.

The Government argues that, notwithstanding the warrant's plain meaning, the limitations of paragraph (a) should be read into the rest of the warrant. After all, in *United States v. Wagner*, we reasoned that when a warrant "as a whole" limits agents' search, then there is no need to "expressly require that each individual category of items for seizure pertain" to the suspected criminal activity. 951 F.3d 1232, 1247 (10th Cir. 2020). But *Wagner* teaches that the warrant is to be "read in context." *Id.* at 1248. There, the warrant included 16 categories of items for seizure, only "a few" of which did not list a specific subject matter. *Id.* Here, the situation is reversed: only one of the seven exemplar paragraphs lists the suspected victim or nature of the conspiracy. While five of those paragraphs reference the Target Offenses, the Target Offenses are referenced in the introductory paragraph anyway. So, our analysis turns on the language of the introductory paragraph, which is limited only by reference to the Target Offenses and the commencement date of the conduct under investigation.

Regarding the Target Offenses, this court has also said that whether a warrant is particularized "depends in part on the nature of the crimes

34

being investigated." *Cooper*, 654 F.3d at 1127. "Warrants relating to more complex and far-reaching criminal schemes may be deemed legally sufficient even though they are less particular than warrants pertaining to more straightforward criminal matters." *Id.* This flexibility becomes relevant where the Government seeks to investigate complex or long-running financial crimes conducted via the internet. *See id.* Evidence in such cases "may be difficult to describe *ex ante* with the same particularity as a murder weapon or stolen property." *United States v. Nejad*, 436 F. Supp. 3d 707, 729 (S.D.N.Y. 2020) (Nathan, J.) (quotation omitted).

But even the need for some flexibility in this type of investigation is not enough to save this warrant. The enumerated Target Offenses are extremely broad. They are: 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1349 (conspiracy to commit fraud); 18 U.S.C. § 1519 (destruction, alteration, or falsification of records); 18 U.S.C. § 1956 (money laundering and conspiracy to commit money laundering); and 18 U.S.C. § 1957 (money laundering). We have held that "[a]n unadorned reference to a broad federal statute does not sufficiently limit the scope of a search warrant." *Leary*, 846 F.2d at 602. And there is no federal statute broader than the general conspiracy prohibition, which includes in its ambit the broad array of enumerated substantive crimes. 18 U.S.C. § 371. Similarly, wire fraud and conspiracy to commit fraud are quintessentially

broad statutes. *See Kousisis v. United States*, 605 U.S. 114, 135 (2025) ("The 'language of the wire fraud statute' is undeniably 'broad.'" (quoting *Pasquantino v. United States*, 544 U.S. 349, 372 (2005))); *Leary*, 846 F.2d at 601 (citing favorably *Roche v. United States*, 614 F.2d 6 (1st Cir. 1980), which found overbroad a warrant limited only by reference to the prohibition against mail fraud).

It is true that the warrant does contain a commencement date that limits the information subject to seizure. But this date does little work because the meaning of the date is ambiguous. It does not specify whether the warrant authorizes seizure of evidence that was created after the listed date, or whether it authorizes seizure of evidence of a crime committed after the listed date (no matter the date the evidence was created). And here, the co-conspirators are married. The warrant provides for seizure of communications going to the "motive for" the conspiracy. No. 24-1333, R. III at 199. Thus, the warrant would apparently allow the Government to seize all evidence about their marital relations contained in Kimberley's Apple account on a theory that the intricacies of their marital relationship may have motivated the crime. This would permit an incredible intrusion into the intimate and personal lives of the warrant's subject and her spouse.

This intrusion is particularly concerning where, as here, the affidavit in support of the warrant application contained significant information that

36

could have been – but was not – used to limit the warrant's scope. Based on that affidavit, Section II of the search warrant could have been narrowed, for example, to include only emails and text messages sent to and from certain known email addresses and phone numbers. By way of further example, the affidavit named several other people thought at the time to be involved in the conspiracy. Section II of the warrant thus could have cabined law enforcement's review by allowing seizure of communications only where one of those names or their accounts were mentioned or implicated. And, of course, the warrant could have been limited to solely evidence of the fraudulent scheme targeting National.

But it was not. This was a very broad warrant, based upon very broad conspiracy statutes, and without sufficient guardrails. Given its extreme breadth and the sheer volume of data and information it disclosed to the Government, we hold that the Apple warrant was not sufficiently particularized to satisfy the Fourth Amendment.

**B**

This is not the end of the analysis, however. Even where a search warrant is insufficiently particularized, its fruits might not necessarily be excluded from evidence. *United States v. Leon*, 468 U.S. 897, 919–21 (1984). As a general matter, evidence obtained in violation of the Fourth Amendment is inadmissible in the Government's case in chief. This

37

remedial rule seeks to remove law enforcement incentives to violate the constitution. *Mapp v. Ohio*, 367 U.S. 643, 656 (1961). But because judges serve a neutral role, the law presumes that they will be unaffected by the operation of the exclusionary rule. *Leon*, 468 U.S. at 917. Thus, reliance upon a warrant issued by a neutral magistrate creates a presumption that the executing officers act in good faith. *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985). That is because the agents executing the search usually "cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *United States v. Knox*, 883 F.3d 1262, 1273 (10th Cir. 2018) (quoting *Leon*, 468 U.S. at 921).

Here, the warrant was authorized by a federal magistrate judge. Hence, we must presume the agents who then executed the judicially authorized warrant did so in good faith. But like most presumptions, this one is subject to rebuttal. There are certain warrants so legally insufficient that executing agents' reliance upon them is so "wholly unwarranted that good faith is absent." *United States v. Corral-Corral*, 899 F.2d 927, 938–39 (10th Cir. 1990) (quoting *Cardall*, 773 F.2d at 1133). In these circumstances, courts ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leary*, 846 F.2d at 607 (quoting *Leon*, 468 U.S. at 922 n.23).

38

This objective test requires the court to review the text of even a facially invalid warrant in the context of the circumstances of the search to determine whether "the agents might have reasonably presumed it to be valid." *United States v. Riccardi*, 405 F.3d 852, 863 (10th Cir. 2005) (quoting *Leary*, 846 F.2d at 607).

Some facially invalid warrants may not be reasonably presumed valid, no matter the context. "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid." *United States v. Santiago*, 135 F.4th 1235, 1240 (10th Cir. 2025) (quoting *Groh v. Ramirez*, 540 U.S. 551, 563 (2004)). But if an officer relies on a defective warrant in a manner that is objectively reasonable, then the evidence may be admitted under the good faith exception to the exclusionary rule. *United States v. Russian*, 848 F.3d 1239, 1246 (10th Cir. 2017). Although our review is de novo, it is the Government's burden to put forward facts that support a finding of good faith. *Leary*, 846 F.2d at 606 n.26.

Although we conclude this warrant was defective, we are also hard-pressed to say that it "plainly" did not comply with the particularity requirement. Relevant caselaw also explains that the standard is quite high. For example, in *Santiago*, we found it plain that the warrant was not

39

sufficiently particular. 135 F.4th at 1240. The warrant there did not name a crime under investigation. *Id.* at 1238. It further called for search of a cell phone and seizure of, *inter alia*, "any other information within said phone that may be deemed evidence that a crime has been or is about to be committed." *Id.* Although the warrant here swept broadly, it was not as sweeping as the warrant disavowed in *Santiago*.

In *Ramirez*, the facts were even more egregious. There, the warrant described a house that was to be searched. 540 U.S. at 558. But it "did not describe the items to be seized *at all.*" *Id.* In finding the good faith exception unavailable, the Supreme Court reasoned that any reasonable officer could have identified the warrant's "glaring deficiency" based on a cursory reading and "perhaps just a simple glance." *Id.* at 564.

Those cases do not present the same lot of facts we have here. The Apple warrant, though defective, made some effort to comply with the particularity requirement. It described and listed the items to be seized. And, though it relied on broad criminal statutes, it referenced the crimes under investigation, which were essentially the same crimes later charged. It also did not include a catchall clause allowing for seizure of "any other information" that might bear on any potential violation of criminal statutes. Thus, the warrant here did not contain the sort of glaring deficiencies that could be identified with as little as a simple glance and that overcome the

presumption of validity inherent in a warrant authorized by a neutral judge.

We consider other circumstances that bear on a finding of good faith. Our caselaw has identified several considerations, some of which are relevant here. If the officer who prepared the warrant application and supporting affidavit also executed the search, this will cut in favor of good faith because the proverbial reasonable officer would have knowledge of the application and affidavit's limits. *Russian*, 848 F.3d at 1246; *Riccardi*, 405 F.3d at 864. If the magistrate judge who signed the warrant also signed the application and affidavit, this will also weigh in favor of good faith because a reasonable officer would assume that the warrant is consistent with the application and affidavit. *Russian*, 848 F.3d at 1247. And if the officer who drafted the warrant sought the assistance of counsel in doing so, this will again weigh in favor of good faith. *Otero*, 563 F.3d at 1134; *Riccardi*, 405 F.3d at 864.

Here, the agent who prepared the warrant application and affidavit did not execute the search. However, the agent who did lead the search had prepared similar applications and affidavits in the same investigation. Her ongoing involvement in the investigation indicates that she would have been aware of the type of evidence subject to seizure and the limitations

that probable cause placed on her review. Although not a strong point, this weighs slightly in favor of good faith.

We next consider that the magistrate judge signed the warrant, the application, and the affidavit. A reasonable officer would think that the federal magistrate judge had the affidavit in his mind at the time of signing the warrant. This also weighs in favor of good faith.

Also, the warrant indicated that it had been reviewed by a prosecutor, whose name was reproduced at the bottom. Unlike the judge, a prosecutor's review of a draft warrant does not merit a presumption of validity because a prosecutor is not in a position of neutrality. However, it shows the agents here sought legal counsel to review the warrant before it was presented to the magistrate judge, which is indicative of good faith on their part.

Finally, the record additionally demonstrates that agents devised and engaged a taint protocol to avoid the improper review of privileged information. These facts also weigh in favor of good faith. They demonstrate an attempt to comply with the constitutional limitations on law enforcement conduct while engaged in a search. But we do not find them to be particularly weighty. Unlike other cases, there is no indication that during the search here the agents ever suspended the search for legal guidance, *see Riccardi*, 405 F.3d at 864, carefully limited the search to

42

relevant evidence, *see id.*, or consulted with a prosecutor regarding the scope and methodology of the search, *see Otero*, 563 F.3d at 1134.

Notwithstanding their varied weights, these considerations – in sum – support the Government's argument that good faith applies. Given the presumption that a warrant authorized by a neutral judge is thereafter executed in good faith, we find that the Government has met its burden to prove good faith. This determination, though, is a close call.

As we have already pointed out, there was an absence of on-point caselaw that would have given law enforcement agents specific guidance on how to draft and execute this type of search warrant. Although our caselaw has discussed and analyzed Fourth Amendment principles for warrants to search and seize electronic information, neither the parties nor this court uncovered an opinion that provided specific guidance on how to properly frame and limit the search and seizure of data and information from a cloud-based account to the extent it occurred in this case. The record is sufficient for us to conclude that the agents who drafted, served, and executed the Apple warrant would "have reasonably presumed it to be valid." *Riccardi*, 405 F.3d at 863. Given our holding that good faith applies, we find no

grounds to reverse the district court's denial of Kimberley's motion to suppress the Apple account warrant.[1]

## IV

Having resolved the Fourth Amendment challenge to the Apple account warrant, we now turn to the denial of the severance motions. Where an indictment joins defendants in a manner that appears prejudicial, a court may order separate trials. Fed. R. Crim. P. 14(a). And a party must move for severance before trial so long as the basis for the motion is reasonably available. Fed. R. Crim. P. 12(b)(3)(D). When facing such a motion, the trial court makes a three-step inquiry: first, it inquires into the antagonistic nature of the defenses; second, it looks to determine which specific trial right is threatened or if there is a risk that joinder would "prevent the jury from making a reliable judgment about guilt or innocence"; and third, it asks whether the threatened prejudice outweighs the interest of judicial economy. *United States v. Pursley*, 474 F.3d 757, 765 (10th Cir. 2007) (quotation omitted).

---

[1] Although courts may sometimes decide the question of good faith without reaching the particularity question, we do not think that is the best path for this case. The particularity argument was well briefed and fully before us. Because there is little caselaw construing particularity in the context of cloud-based accounts, it is prudent to analyze both particularity and good faith in this context, noting the officers here acted without the benefit of the specific guidance from an authoritative opinion.

On appeal, both Kimberley and Michael argue that the district court erred in denying timely motions to sever their trial. We disagree. Neither Kimberley nor Michael timely moved in the district court. Kimberley does not argue good cause for her untimeliness or plain error in her opening brief on appeal. Michael argues good cause but fails to make the requisite demonstration. We see no reason to review the point on appeal. But, even if we did, we would find both Kimberley and Michael's arguments fail on the merits.

## A

Kimberley argues on appeal that she raised the basis for her severance motion as soon as it became reasonably available. She further argues that the district court erred by denying the motion on the merits. We address these arguments in turn.

Although Kimberley's first point sounds in timeliness, we think the issue is better understood through the lens of forfeiture. To preserve an issue for appeal, a party must "alert[] the district court to the issue and seek[] a ruling." *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1142 (10th Cir. 2009) (quotation omitted). It is not enough that a party present a related theory – she must request a ruling on the same issue raised on appeal. *Id.* Otherwise, we will treat the issue as forfeited on appeal. *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir.

2019). And, where the issue has been forfeited, we would generally require a party to argue for plain error in her opening brief. *Id.*

Kimberley raised a related argument for severance in a pre-trial motion. But that does not preserve the issue now on appeal. The issue in her opening brief on appeal was first raised at trial following Michael's cross-examination of Yioulos. Kimberley's attorney then stated that she would "need to supplement the record . . . with respect to our Motion To Sever." No. 24-1333, Supp. R. I at 696. After describing the adverse nature of the testimony, she said: "I wanted to just make that record, which apologies, Your Honor, I will probably continue to do throughout trial, because I think that's what the caselaw requires. So, I just wanted to make that record on severance." *Id.* at 697.

This, we think, was sufficient to alert the district court to the issue. However, Kimberley never sought a ruling from the district court on the specific argument she presented after cross-examination of Yioulos. Kimberley's theory of severance on appeal – arising under *Pursley* – is legally distinct from the theory presented in the pre-trial motion, which arose under *Bruton v. United States*, 391 U.S. 123 (1968). Because Kimberley never made a *Pursley* motion before trial, there was no such motion to supplement at trial. And because she did not file a written motion at trial – despite the district court's solicitation – she never requested a

46

ruling from the district court. Thus, the argument now raised on appeal was never properly presented to the district court.

Kimberley does not argue for plain error in her opening brief on appeal. Instead, in a footnote, she cites an unpublished out-of-circuit case for the proposition that plain error is inapplicable. But in the Tenth Circuit, "[w]hen an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all – for plain error or otherwise." *Leffler*, 942 F.3d at 1196. Appeals from unpreserved severance motions in this circuit present an even higher bar: we will not review them "in the absence of good cause." *United States v. Herrera*, 51 F.4th 1226, 1271 (10th Cir. 2022) (citing *United States v. Bowline*, 917 F.3d 1227, 1237 (10th Cir. 2019)). And because Kimberley does not even attempt to show good cause for her failure to timely request relief, *see* Op. Br. at 41 n.6, Reply Br. at 23–29, her argument is doubly unavailable.

Even if we did exercise our discretion to decide the merits, it would not grant Kimberley any relief. Again, trial courts considering severance ask: first, "whether the defenses presented are 'so antagonistic that they are mutually exclusive;'" second, whether the defendant has shown "a serious risk that a joint trial would compromise a specific trial right . . . or

prevent the jury from making a reliable judgment about guilt or innocence;" and, third – if the first two factors are met – whether the prejudice to a given defendant caused by joinder outweighs "the obviously important considerations of economy and expedition in judicial administration." *Pursley*, 474 F.3d at 765 (alteration in original) (quotations omitted). Kimberley presents only a skeletal argument that she suffered prejudice from the joint trial. And she includes not even a sentence of her brief discussing the other side of the balancing test – the costs of judicial administration.

The jury was instructed to consider the evidence separately as to each defendant and to return a separate verdict as to each defendant. We will generally presume that the jury follows the court's instructions. *United States v. Hargrove*, 911 F.3d 1306, 1319–20 (10th Cir. 2019). Here, this presumption is also supported by the record. Count 48 charged both Michael and Kimberley with money laundering, 18 U.S.C. § 1957, in connection with a withdrawal of $20,000 on September 26, 2019. On this count, the jury found Michael guilty but acquitted Kimberley. This demonstrates that the jury did indeed consider the evidence separately against Michael and Kimberley. It is surely sufficient to refute her skeletal prejudice argument. We hold that Kimberley waived her severance argument. But even if she had preserved it, the argument would fail on the merits.

48

**B**

For Michael, there is no issue of forfeiture. He unequivocally moved to sever on the first day of trial on the basis of antagonistic defenses. He then filed a trial brief in support of the motion to sever. The issue is preserved for appeal. Before this Court, Michael argues that his mid-trial motion for severance was timely under Federal Rule of Criminal Procedure 12. He further argues that the district court erred by denying his severance motion. We address his arguments, beginning with timeliness.

The timeliness of a severance motion is set out by Federal Rule of Criminal Procedure 12. It provides that a motion for severance of defendants "must" be made before trial "if the basis for the motion is then reasonably available." Fed. R. Crim. P. 12(b)(3). Where a party does not make the motion timely, a court still has discretion to consider it on a showing of good cause. Fed. R. Crim. P. 12(c)(3). Because Michael did not submit his motion before trial, his appeal requires us to determine when, precisely, the basis for his motion was "reasonably available" under Rule 12.

This appears to be a question of first impression in this circuit. The text of the Rule itself sheds little light. The Committee Notes from the 2014 Rule Amendment state that claims covered by the Rule will generally be available pre-trial and should be resolved then. The "reasonably available"

49

language, though, is intended to capture a claim that "a party could not have raised on time." Fed. R. Crim. P. 12(b)(3) advisory committee's note to 2014 amendment.

The standard of review on a district court's determination regarding reasonable availability under Rule 12 is also an open question in this circuit. In making its determination, the district court was required to approach a quintessentially mixed question of fact and law. In the first instance, the district court is best positioned to observe the facts and positions of the parties as they develop over the course of the litigation and decide when the basis of the motion has become reasonably available. This reality favors a deferential standard of review. Therefore, we review the timeliness of a motion to sever for abuse of discretion. *See United States v. Burrage*, 75 F.4th 953, 957 (8th Cir. 2023) (reviewing determination of Rule 12 untimeliness for abuse of discretion); *cf. Bowline*, 917 F.3d at 1237–38 (reviewing existence of good cause to excuse untimeliness under Rule 12 for abuse of discretion).

A district court has acted within its discretion so long as it has not made "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *F.D.I.C. v. Oldenburg*, 34 F.3d 1529, 1555 (10th Cir. 1994) (quotation omitted). And we may reverse only if we have a "definite and firm conviction that the lower court made a clear error of judgment or

50

exceeded the bounds of permissible choice in the circumstances." *Nalder v. W. Park Hosp.*, 254 F.3d 1168, 1174 (10th Cir. 2001) (quotation omitted).

We find no such abuse in the district court's ruling that the basis for the motion was reasonably available to Michael before trial. In its order finding a lack of timeliness, the district court reasoned that the relevant standard is whether the basis for severance was "'reasonably available' prior to trial, not definitively available." No. 24-1465, R. III at 141. And, the district court concluded, Michael "could have seen this coming, at least at a high level, particularly given the case history" marked by mutually inculpatory proffer statements, discussion of potential conflicts posed by joint representation, and Kimberley's pre-trial argument (while still jointly represented) that she would be prejudiced by an inability to cross-examine Michael. *Id.*

The district court correctly discerned that Rule 12 does not require a criminal defendant know with absolute certainty that his defense will be adverse to a codefendant's defense at trial. Here, Michael and Kimberley had inculpated one another in the scheme long before the grand jury returned an indictment. Kimberley had – while represented by the same counsel as Michael – argued for severance because she might need to confront Michael concerning his statements to investigators. Michael had access to the extensive discovery reflecting money flowing through bank

51

accounts in his name, not Kimberley's. And Michael surely was aware of Kimberley's proffer statements that he and Yioulos had cut her out of the scheme and "literally stole[n] money from the government," No. 24-1465, R. IV. at 876. Whatever the precise contours of Rule 12's "reasonably available" standard, it was met here.

Michael's only effort to challenge the district court's finding of a lack of good cause is a conclusory statement that "it is fair to say that a non-frivolous claim of prejudice constitutes 'good cause.'" No. 24-1465, Op. Br. at 44. But that is not correct. Prejudice is only one component of the merits of the severance analysis. And if non-frivolity on the merits were sufficient to constitute good cause, then every motion of colorable merit would necessarily have its timeliness excused. Such a rule would render the timeliness requirement meaningless. We will not endorse this theory. Michael has not shown the district court abused its discretion by finding no good cause to excuse his tardiness. And, because we will not review an untimely Rule 12 motion absent good cause, *see Herrera*, 51 F.4th at 1271 (citing *Bowline*, 917 F.3d at 1237), Michael's argument on appeal can go no further.

But even if we reached the merits of the severance motion, Michael's argument would fail. In this analysis, *Pursley*'s three prongs would apply: mutually exclusive defenses; serious risk to a specific trial right or a reliable

verdict; and the balance of prejudice against judicial economy. 474 F.3d at 765. Michael's argument would satisfy none of these prongs.

We have explained that the first prong of this analysis may not be satisfied by merely adverse defenses. Instead, the party moving for severance must show that the conflict is such that "the jury, in order to believe the core of one defense, must *necessarily* disbelieve the core of the other." *United States v. Jones*, 530 F.3d 1292, 1304 (10th Cir. 2008) (quoting *United States v. Dazey*, 403 F.3d 1147, 1165 (10th Cir. 2005)). Here, Michael's defense centered on the twin theories that Yioulos was not credible, and that Kimberley had manipulated Michael into committing fraud. Kimberley's defense was much more direct: Michael and Yioulos committed the fraud, not her. But our caselaw explains that this is not sufficient to demonstrate mutually exclusive defenses. "In our view, the jury could have simultaneously believed that the government's witnesses were lying about [Michael]'s involvement in the [wire] fraud conspiracy and that [Kimberley] did not knowingly commit [wire] fraud." *Jones*, 530 F.3d at 1304. "Here, the mutual antagonism complained of by defendants amounts to no more than finger pointing." *United States v. Linn*, 31 F.3d 987, 992 (10th Cir. 1994). This is not enough to show defenses are mutually exclusive. The merits of Michael's argument would fail on the first prong.

53

Michael would fare no better on the second prong. Michael argues that mutually exclusive defenses constitute a per se demonstration of serious risk to a specific trial right or a reliable verdict. But that is not the law. We have announced that "[m]utually antagonistic defenses are not prejudicial per se." *Pursley*, 474 F.3d at 765 (alteration in original) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). A defendant may not satisfy the second prong by mere reference to the first – we foreclosed the same argument in *Pursley. See id.* at 765–66. Any reference to prejudice would be hard to square with the jury verdict's distinction between the two defendants. In fact, Michael may have benefitted from the joint trial. Had the trial been severed, evidence of Kimberley's actions may not have otherwise been admissible. Thus, Michael would have had less evidence of Kimberley's alleged manipulation to support his theory of defense.

The third prong would go the same way. Even assuming some minor prejudice, the district court did not abuse its discretion by finding that any prejudice was outweighed by judicial economy. To rule at trial for Michael, the district court would need to declare a mistrial, excuse the already-seated jury, revisit motions in limine that presumed the existence of a joint trial, and set two new trials. It is for these reasons that Rule 12 requires motions be brought before trial where available.

54

In this case, vacating the trial to start anew would be particularly burdensome, given that pre-trial proceedings had already spanned more than three years – in no small part due to Michael and Kimberley's repeated firing and hiring of new lawyers and insistence upon joint representation, despite its obvious risks – risks that Michael now seeks to leverage to his benefit on appeal. Michael's motion was untimely, and the issue thus not properly presented on appeal. But even if we were to reach the merits, we would find for the Government on all three prongs.

Both cases are AFFIRMED.